Jones, Chief Judge,
delivered the opinion of the court:
Plaintiffs sue to recover $2,342.13 for extra labor costs incurred in the performance of a lump-sum construction contract entered into with defendant on June 28, 1944, for the construction of hangars, warehouse and terminal facilities at the New Castle Army Air Base, New Castle County, Delaware. The increased costs resulted from payment by plaintiffs of a higher wage rate to laborers working on the project than the rate specified in the contract specifications.
In conformity with the act of August 30, 1935,[1] known as the Davis-Bacon Act, the invitation for bids provided that the contractor would be required to pay all mechanics and laborers employed on the site of the work the rates of wages stated in the specifications, referring particularly to Article 17 of the contract. It was further stated that wage rates for the locality of the work had been determined by the United States Department of Labor on August 26,1942, and subsequently 'modified November 1, 1943, January 10, 1944, and February 14,1944. Paragraph 1-16 of the specifications provided in part as follows:
*33 (a) The wages to be paid laborers and mechanics on this project, as determined by the Secretary of Labor to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the pertinent locality, are as follows:

Classification Bate per hour

Laborers, building_$0. 75
Laborers, concrete_ . 75
Laborers, unskilled- . 75
Article 17 of the contract, referred to in the invitation, provided that the contractor must pay all labor employed directly upon the site of the work wages “not less or more than those stated in the specifications (subject to Executive Order Number 9250 and the General Orders and Regulations issued thereunder) regardless of any contractual relationship which may be alleged to exist between the contractor * * * and such laborers and mechanics;”.
The invitation for bids also provided in pertinent part as follows:
20. Investigation oe Conditions. — Bidders are expected to visit the locality of the work, and to make their own estimates of the equipment and other facilities needed and to evaluate difficulties attending the execution of the proposed contract, including local conditions, availability of labor, transportation facilities, uncertainties of weather, and other contingencies. * * * Failure to acquaint himself with all available information concerning these conditions will not relieve the successful bidder of assuming all responsibilities for estimating the difficulties and cost of successfully performing the complete work.
Plaintiffs investigated the conditions at the site of the work but did not inquire into the labor situation. Relying entirely upon the wage provisions in the contract and specifications, plaintiffs estimated their bid, making no allowance for a possible increase in wage rates. Plaintiffs were low bidders and their contract with defendant was executed on June 28,1944, to be completed in 90 days.
Early in July when plaintiffs were prepared to commence work under the contract, they applied to Local No. 199, Hod *34 Carriers’, Building and Common Laborers’ Union, A. F. of L., for laborers. At that time shipyards in the New Castle area were paying a starting wage rate of 78 cents per hour to unskilled labor. These jobs carried the classification of “helper” and the rate of pay increased to $1.00 per hour as the worker’s skill increased. There was apparently sufficient work available in the shipyards and munitions factories in the area to provide work for considerable numbers of the building construction workers who were members of Local 199. As a result of this situation, the local union was unable to supply plaintiffs with laborers to work at the 75-cent-per-hour rate specified in their contract. Plaintiffs’ subsequent application to the Area Office of the War Manpower Commission met with no better success. During the first three weeks of, the contract when plaintiffs should have been working from 20 to 35 laborers on the job, they had been able to employ only 5 laborers and two pushers (straw bosses) and these men were recruited from Army enlisted personnel who worked on their days off with the consent of their commanding officer.
At the end of the third week plaintiffs reported their difficulties to the contracting officer. Plaintiffs appear to have been familiar with wage stabilization laws and regulations and suggested an application to the Wage Adjustment Board for permission to pay a rate to laborers sufficiently higher than the contract rate to enable them to meet competition in the local labor market. The contracting officer approved of this course of action and assigned a civilian employee to assist plaintiffs in preparing their application to the Board. The contracting officer asked plaintiffs if they proposed to request reimbursement from the Government in the event the wage increase was allowed. Plaintiffs replied that they would reserve their right to do so, apparently depending on the amount involved.
As supporting data for their wage adjustment application plaintiffs secured a letter from the Area Director of the War Manpower Commission and one from the local laborers’ union. The letter from the War Manpower Commission was in response to a letter from plaintiffs inquiring as to the differences in pay scale for common labor in the vicinity,- *35 and advised plaintiffs that local industrial plants and shipyards in the area were paying “helpers” rates ranging from 78 cents to $1.00 per hour. The letter from the union, which executed the application for wage adjustment jointly with plaintiffs, read in part as follows:
This is to notify you that it is impossible to furnish men for the rate of 750 per hour. Owing to high cost of living the men cannot make or meet their current expenses.
The contract for 75$ per hour expired August of 1943. That was set by the Government September 17, 1942. I am not making a demand for more money but men of today will not work for any less than 85‡ per hour. Many Bosses are paying the above mentioned rate and more. The Bosses have the work, likewise they have to get it off their hands, so consequently they pay 850 per hour or more on various occasions. This is the reason why I am notifying Bosses and etc., who employ men from this Local No. 199.
I have been advised by Bosses to send notices for a protection of some kind or for a protection to them so as to avoid difficulties on governmental work. So, I trust that this is a protective notice for the benefit of the Bosses and other concerns who hire or employ laborers of Wilmington and Vicinities.
The joint application for approval of wage rate adjustment was executed by the union and plaintiffs on July 20, 1944. It stated, among other things, that between 40 and 50 laborers were involved; that the laborers’ rate in the area on January 1, 1941, had been 70 cents per hour; that the “present wage rate” was 75 cents and that the “proposed wage rate” was 85 cents per hour. The statement of facts in justification of the proposed adjustment read in part as follows:
The project requiring labor is located approximately four to five miles outside of Wilmington in a location difficult to reach by public transportation, and with the local demand for common labor in the shipyards, which are readily accessible and where the rates are higher than the prescribed rate for concrete and labor used in the building industry, the men will not report for hiring while the demand still exists at higher rates. * * * The decrease in the membership of Local #199 from approximately 1,200 to about 200 is evidence of *36 tbie shift from the building trades to the shipyards and local industry.
■ On August 9, 1944, the Wage Adjustment Board considered the application and issued a decision authorizing the payment of 85 cents per hour to laborers, building, concrete, and unskilled, by plaintiffs. Both the interim decision and the formal decision provided that the authorization was “limited to the instant contract” only. In its formal decision the Board found that the contract work was essential to the effective prosecution of the war and that a rate of 85 cents per hour for building laborers was necessary to enable plaintiffs to obtain laborers for this work. On August 12, 1944, the Board sent plaintiffs the following telegram:
Wage Adjustment Board authorized on August 9 rate of $0.85 for building concrete and unskilled laborers to apply on construction work for War Department by Irwin & Leighton at Army Air Base project New Castle Delaware this adjustment applicable to instant project only approved by National War Labor Board August 9 and effective August 9.
The contracting officer was of opinion that the Board’s telegram was sufficient authority for plaintiffs to pay the 85-cent rate and beginning on August 16, 1944, the laborers’ union commenced supplying plaintiffs with the required number of building laborers. From that date to the completion of the contract plaintiffs paid their laborers at the rate of 85 cents per hour.
On August 18, 1944, plaintiffs wrote to the contracting officer informing him that they proposed to claim reimbursement for extra costs incurred by virtue of the higher rate for laborers. On September 6, 1944, the contracting officer wrote to plaintiffs advising that the War Department did not consider the additional expense in question a reimbursable item because in bidding a lump sum without qualification, plaintiffs assumed the risk of increased labor costs.
On September 30,1944, plaintiffs appealed to the Secretary of War from the contracting officer’s decision, pursuant to Article 15 of the contract. On March 19, 1945, this appeal was denied on the grounds that the contract did not au *37 thorize reimbursement for such increased costs; that the contract did not guarantee that laborers would work for the specified rate; that the Government’s action in authorizing the wage increase was merely an act in aid of the contractor; and that if plaintiffs were claiming that the 75-cent rate was a misrepresentation, the Board had no jurisdiction to give relief.
Plaintiffs contend that they are entitled to recover the extra costs incurred by virtue of the above-mentioned wage adjustment under the holdings of this court in both the majority and concurring opinions in the case of Sunswick Corporation v. United States, 109 C. Cls. 772 (cert. den., 334 U. S. 827). While the facts alleged in plaintiffs’ petition and repeated in the briefs do appear to bring this case within the orbit of the Swnswick decision, the testimony and exhibits introduced by plaintiffs[2] fail in material respects to establish such necessary facts.
Both this case and the Swnswick case involved lump sum construction contracts in which the contractor was directed co pay all labor employed on the work at wage rates “not less or more than those stated in the specifications (subject to Executive Order Number 9250 and the General Orders and Regulations issued thereunder).” In both cases we found that General Order 13 issued pursuant to Executive Order 9250 provided that “The Wage Adjustment Board shall have power * * * (1) to hear and issue directive orders, in labor dispute cases, and (2) to make final rulings on voluntary wage and salary adjustments requiring the approval of the National War Labor Board.” In the Swnswick case plaintiff, prior to making its bid, investigated conditions at the site of the work including the labor situation and determined to its satisfaction that the rate for carpenters, among others, determined by the Secretary of Labor to be $1.25 and so carried in the specifications, was the prevailing rate for carpenters. Indeed, during the early part of the work on the contract, plaintiff was able to and did hire carpenters at $1.25 per hour. However, during the third week of the contract, the *38 local carpenters’ union informed plaintiff tKat the work being done by carpenters on this project was “water-front work” which carried a rate of $1.4214 per hour, and demanded that this rate be paid to all carpenters employed on the project. Plaintiff at all times disputed the union’s contention, and after the United States Conciliation Service had failed to settle the controversy, the Secretary of Labor certified the matter as a dispute case to the National War Labor Board which in turn referred the dispute to the Wage Adjustment Board to which it had delegated authority for determining such disputes. After a full hearing before a hearing officer with representatives of plaintiff, the union, and the contracting officer participating, the Board adopted the recommendations of the hearing officer which were favorable to the union’s claims and issued a directive order to plaintiff directing it to pay all carpenters on the project on waterfront work, as defined in the order, $1,421/4 per hour retroactive to the beginning of the project. We held that plaintiff’s contract, giving effect to the clause above quoted with reference to Executive Order 9250, obligated plaintiff to pay its carpenters either the $1.25 per hour specified as both the minimum and maximum rate, or in the event of a labor dispute, such other figure as, under the machinery set up pursuant to Executive Order 9250, it might be directed to pay. We then concluded that plaintiff was required to pay the increased wages ordered by the Wage Adjustment Board’s directive order, or subject itself to the penalty of either having the unpaid difference withheld or its contract terminated, and that the War Department had, by the terms of its contract, delegated to the Wage Adjustment Board authority to modify the specifications as to wage rates. Thus it resulted that the Government in its capacity as a contracting party imposed on the plaintiff a burden of performance which it was not intended by the contract should be borne by plaintiff without an adjustment of the contract price.
Aside from the terms of the two- contracts, the facts as proved in this case are quite different from the facts in the Sv/nswick case, and indeed, somewhat different from those alleged in the petition. There was no. labor dispute between plaintiffs and the union in the instant case. The situation *39 was simply that because the building laborers could find employment in the shipyards and munitions factories closer to their homes as helpers (an industrial classification not existing as such in the building trades) at higher rates than the building rates in the area, such building laborers were unwilling to travel several miles to this project and work for less money than they could earn in the shipyards and factories. Plaintiffs were willing to pay the union demands, although they indicated they might request reimbursement from the Government, and in fact, the union and plaintiffs made a joint application to the Wage Adjustment Board for approval of a higher rate.
If plaintiffs had heeded the admonition in paragraph 20 of the specifications and investigated the availability of labor at the contract rates and the transportation facilities in the area, it is probable that they would have discovered that the shipyards and munitions factories in Wilmington were absorbing most of the available labor in the area at industrial wage scales slightly higher than the building scale. Understanding, as they did, the working of the wage stabilization program, and knowing the approximate .number of laborers they would require on the job, plaintiffs could have added the necessary amount (in this case approximately $2,000) to their bid to take care of the adjustment they would have to ask for.
The proceeding before the Wage Adjustment Board was in no sense an adversary proceeding; no hearing was held; the application was submitted by the union and plaintiffs jointly, supported by a letter from the union itself and one from the War Manpower Commission relative to shipyard industrial rates. The decision of the Board did not direct plaintiffs to do anything; it merely authorized plaintiffs to pay the higher rate, but on this job alone, and as of the date of the Board’s decision, not retroactively. Contrary to plaintiff’s allegations, this was not a directive order. The decision of the Board was made pursuant to General Order 13 providing that the “Wage Adjustment Board shall have power * * * (2) to make final rulings on voluntary wage and salary adjustments requiring the approval of the National War Labor Board.” [Italics supplied.]
*40 If it be said that the Wage Adjustment Board, by the terms of the contract, acted for the War Department under delegated authority in issuing this decision, it did no more than waive the requirement that plaintiffs pay no more than the rate specified in the contract. In so doing it cannot be said that the Government in its capacity as contractor acted in such a way as to increase plaintiffs’ burden in a manner which it was not intended by the contract should be borne by plaintiffs without an adjustment of the contract price.
At the hearing in this case plaintiffs testified that they were familiar with the processes of the Wage Adjustment Board and knew that authorization was necessary before a higher wage rate might be paid. Presumably they knew that such permission was, in a proper case, granted. In the absence of a provision in the contract that the Government would make reimbursement for extra costs incurred by virtue of increased payments made pursuant to such authorizations, or a commitment on the part of the contracting officer that such reimbursement would be made, or, as in the case of the laborers in the Paretta[3] case, a wrongful order by the contracting officer to pay such increased rate, we are unable to find any basis for holding plaintiffs entitled to recover its increased laborer costs.
Plaintiffs next contend that in any event they are entitled to recover on the ground of misrepresentation, citing the concurring opinion in the Sunswick case and our decision in Albert & Harrison, Inc., v. United States, 107 C. Cls. 292. The concurring opinion in the Swnswick case is not necessarily the prevailing basis of that decision, but assuming it to be, the facts as proved in the instant case do not bring it within its terms nor within the scope of our decision in the Albert & Harrison case.
In support of their argument on this point plaintiffs allege that the Secretary of Labor did not make a survey of the wage situation in the area prior to issuing the determination contained in the specifications as required by the Davis-Bacon Act; that the rate for building laborers in the area was not 75 cents per hour as evidenced by the statements of the Union and the War Manpower Commission; that *41 85 cents per hour was actually the prevailing rate for ing laborers in tbe area and had been paid by a cost-plus-a-fixed-fee contractor who was reimbursed by the Government for such cost; and that the defendant was in a position to know and did know that the Laborers’ Union at Wilmington had not renewed its agreement with the Labor Department at the termination of the first year to continue the July 1, 1942, wage rates in effect.
The evidence in this case establishes that on August 26, 1942, the Secretary of Labor issued a decision covering wage rates for the War Department’s project at the New Castle Army Air Base; that these rates were modified on November 1, 1943, January 10, 1944, and February 14, 1944. The last modification was approximately four months prior to the execution of plaintiffs’ contract, indicating that some sort of a review of the wage schedule was made at that time. Plaintiffs do not offer to prove that a similar review was not made just prior to the letting of the instant contract. The fact that the laborers’ rate was not changed in the specifications is not proof of such a failure to review because the evidence in the case establishes that as of the date the contract was let, 75 cents per hour was the prevailing rate for building laborers. Contrary to plaintiffs’ allegation, the War Manpower Commission did not state that the building rate for laborers was in excess of 75 cents per hour; it merely stated that the industrial rate for helpers in the shipyards started at 78 cents per hour. The statement of the Union in its letter of July 20,1944, and submitted to the Wage Adjustment Board in support of its joint application with plaintiffs for a wage increase and quoted above in this opinion, is scant support for plaintiffs’ allegation that a cost-plus contractor had paid the rate requested and been reimbursed by the Government therefor. At-best the letter appears to indicate that the men were dissatisfied with the 75 cent rate and hoped for an increase. The 85 cent rate requested represented a 15 cent per hour increase over the 70 cent January 1, 1941, rate for laborers in this area, and because such increase was more than 15 percent of that base rate, approval of the Wage Adjustment Board and the National War Labor Board would have to be secured before *42 it could be put into effect.[4] There is no evidence that any attempt to secure such approval was ever made prior to the application involved in this case. The ruling of the Wage Adjustment Board on the instant application did not find that 85 bents per hour was the prevailing or “present rate.” It merely found that payment of that rate was necessary to enable plaintiffs to secure the necessary laborers to man that particular job and the authorization to pay such rate was limited to that job alone. There is no proof that the rate ever became the rate for building laborers generally in that area.
Plaintiffs’ last allegation with respect to the agreement between the Laborers’ Union at Wilmington and the Labor Department, apparently has reference to the Wage Stabilization Agreement entered into May 22, 1942, by the Building and Construction Trades Department of the American Federation of Labor and certain Government contracting agencies. That agreement seems to have been a voluntary pledge on the part of the unions to stabilize wages as much as possible for the duration of the war. In October 1942 this voluntary agreement was supplanted largely by the enactment of wage and price stabilization laws and regulations,[5] making the fact that it was not renewed a year later of little significance.
On the record in this case we must conclude that there is no evidence of misrepresentation or even mistake with respect to the 75 cent per hour laborers’ rate contained in the specifications.
A somewhat analogous situation arose in the Paretta case. In that case, several months subsequent to the execution of plaintiffs’ contract, the laborers’ union in the area petitioned the Wage Adjustment Board and secured an increase of 5 cents per hour in the laborers’ rate “on all going Federal Public Housing Authority projects (and certain others)” in the area of plaintiffs’ contract. There was no dispute concerning the fact that the lower rate specified in the Paretta ' *43 contract was the prevailing rate at the time the contract was executed and up to the time of the Board Action. Following the ruling of the Wage Adjustment Board, the contracting officer through its project engineer ordered plaintiff to pay the new rate. In that case we held that the activating cause of plaintiff’s paying the increased rate was the Government’s demand that it do so, and we allowed recovery. However, we found that the ruling of the Wage Adjustment Board with respect to the increase in laborers’ rate was merely permissive and we indicated, by way of dictum, that had plaintiff 'voluntarily paid the increased rate, no ground for recovery would have existed.
In the present case the Wage Adjustment Board did not issue a directive order as in the Sumswich case, but rather a ruling permitting the payment of a higher rate in response to the joint application of plaintiffs and the union. Unlike the Paretta case, there was no order by the contracting officer directing plaintiffs to pay the increased rate. As distinguished from the Albert & Harrison, Inc., case, the rate in question was the prevailing rate for the classification involved in the area and there was no mistake or misrepresentation on the part of defendant or the Secretary of Labor.
Under the general basic act, commonly known as the Tucker Act,[6] the Government of the United States has con-sentéd to be sued in certain classes of claims. In instances of the kind presented here that consent is limited to such claims as arise under contract, express or implied. We are unable to find within the four corners of this contract any legal obligation, either express or implied in its terms, to compensate plaintiffs for voluntary increases in the wages paid to laborers.
Under the terms of plaintiffs’ contract and the facts in the case, plaintiffs are not entitled to recover, and the petition is therefore dismissed.
Howell, Judge; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.

 49 Stat. 1011, as amended by the act of June 15, 1940, 54 Stat. 399 (U. S. Code, Title 40, sees. 276a and 276a-l).

 Defendant produced no witnesses and introduced only one exhibit, i. e., a copy of the “Application for Approval of Wage Rate Adjustments” executed by the union and plaintiffs July 20,1944.

 Paretta Contracting Co. v. United States, 109 C. Cls. 324.

 Executive Order 9250, 3 CFR 1213, 7 F. R. 7871; Executive Order 9328, 3 CFR 1267, 8 F. R. 4681.

 56 Stat. 765, CR. 578 (Public Law 729).

 24 Stat. 505.