### BINGHAMTON CONST. CO., Inc. v. UNITED STATES.

#### No. 48525.

United States Court of Claims.

Decided Oct. 7, 1952.

---

Jerome Beaudrias, Yonkers, for the plaintiff.

James J. Sweeney, Washington, D. C., Holmes Baldridge, Asst. Atty. Gen., for the defendant.

The Court, upon the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, makes the following

### Special Findings of Fact.

1. Plaintiff is, and at all times material herein has been, a corporation organized and existing under the laws of the State of New York with its principal office and place of business at Binghamton, New York. Since its formation in 1929, it has been engaged in business as a general contractor.

2. On March 29, 1941, defendant, acting by and through the War Department's Corps of Engineers' Office at Binghamton,

New York, invited bids for the construction of Flood Protection Project (Section No. 1) along the north bank of the Chemung River, within the limits of the city of Elmira, Chemung County, New York. In response to said invitation, plaintiff submitted a bid based upon a unit price applied to the various operations involved in the performance of the work in the total sum of $232,669.30. This bid was accepted by defendant on May 14, 1941. On that date plaintiff and defendant entered into a written contract, No. W–321–eng–261, which was approved June 3, 1941. On June 5, 1941, defendant gave plaintiff a formal notice to proceed with the work. Actual work commenced on the site of the job on June 3, 1941.

3. The contract was performed by plaintiff, and it has been paid the contract price, as adjusted, for change orders with the exception of $100 which plaintiff instructed the District Engineer to withhold, and plaintiff has refused to accept said $100 from defendant on advice of its counsel.

4. Plaintiff sues for the sum of $37,-317.19, the total of three separate claims, as follows:

Claim for reimbursement of
wage rates paid to carpenters,
laborers, and concrete puddlers ........................ $15,597.38
Claim as regards measuring of
sheeting and shoring ........ 14,785.55
Claim for finishing of concrete 6,934.26
                                   ———————
    Total .................... $37,317.19

Each claim will be discussed separately.

### Wage Rates

5. Before bidding, plaintiff was furnished a copy of the specifications. Section 1–31 of such specifications reads, insofar as here pertinent, as follows:

1–31. *Wage and Labor Provisions.* (a) The Secretary of Labor has determined the minimum wage rates applicable in the locality for the labor classifications anticipated to be used on the work. In accordance with Article 17 of the contract, employees at the site shall be paid not less than these wages as listed below:

| Designation | Wage rate—hourly |
| --- | --- |
| Carpenters, Journeymen | $1.00 |
| * * * * * * | |
| Laborers, unskilled | 0.50 |
| Laborers, Concrete Puddlers | 0.50 |

&ast; &ast; &ast; &ast; &ast; &ast;

6. Article 17 of the contract reads as follows:

"Article 17. *Rate of wages* (in accordance with the act of August 30, 1935, 49 Stat. 1011 (U.S.Code, title 40, sections 276a and 276a–1 [40 U.S. C.A. §§ 276a, 276a–1]), this article shall apply if the contract is in excess of $2,000 in amount and is for the construction, alteration, and/or repair, including painting and decorating, of a public building or public work within the geographical limits of the States of the Union or the District of Columbia).—

"(a) The contractor or his subcontractor shall pay all mechanics and laborers employed directly upon the site of the work, unconditionally and not less often than once a week, and without subsequent deduction or rebate on any account, the full amounts accrued at time of payment, computed at wage rates not less than those stated in the specifications, regardless of any contractual relationship which may be alleged to exist between the contractor or subcontractor and such laborers and mechanics; and the scale of wages to be paid shall be posted by the contractor in a prominent and easily accessible place at the site of the work. The contracting officer shall have the right to withhold from the contractor so much of accrued payments as may be considered necessary by the contracting officer to pay to laborers and mechanics employed by the contractor or any subcontractor on the work the difference between the rates of wages required by the contract to be paid laborers and mechanics on the work and the rates of wages received by such laborers and mechanics and not refunded to the contractor, subcontractors, or their agents.

"(b) In the event it is found by the contracting officer that any laborer or mechanic employed by the contractor or any subcontractor directly on the site of the work covered by the contract has been or is being paid a rate of wages less than the rate of wages required by the contract to be paid as aforesaid, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been a failure to pay said required wages and prosecute the work to completion by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess costs occasioned the Government thereby."

7. On October 22, 1940, the Elmira business agent of the United Brotherhood of Carpenters and Joiners of America, Local 532, wrote to the United States Engineer's Office in Binghamton, New York, to inform it that the wage scale for carpenters would be increased as of January 1, 1941, from $1 per hour to $1.125 per hour. On October 29, 1940, the District Engineer acknowledged receipt of this letter.

8. On January 31, 1941, the Secretary of Labor furnished to the Corps of Engineers at its request, for inclusion in the contract specifications, the schedule of minimum wages in the Elmira area. Such schedule, which is set out in finding 5, was included in the specifications which were furnished to plaintiff prior to the computation of its bid. As stated in finding 2, invitations for bids were issued on March 29, 1941, and plaintiff's bid was accepted on May 14, 1941.

9. On March 4, 1941, the Secretary of Labor furnished to the Public Buildings Administration of the Federal Works Agency a schedule of minimum wages in the Elmira area for inclusion in the bidding specifications and contract for a Federal Housing Project in Elmira, New York. The prevailing wage rates shown therein, in pertinent part, were as follows:

| Classification | Hourly rate |
| --- | --- |
| Carpenters, Journeymen | $1.125 |
| Laborers, unskilled | 0.55 |

10. Plaintiff employed only union labor on this project. At the time plaintiff began work on the site on June 3, 1941, it had to pay $.625 per hour for laborers and $1.125 per hour for carpenters. The carpenter wage rate had been put into effect by the union on January 1, 1941, and the laborer wage rate on April 1, 1941.

11. On June 16, 1941, plaintiff advised the District Engineer (who was the contracting officer) that the minimum wage rates provided in the contract specifications were less than the rates currently prevailing in the Elmira locality for carpenters, laborers (unskilled), laborers (concrete puddlers), and truck drivers.

12. The District Engineer replied on June 27, 1941, stating that the minimum wage rates were determined in strict accordance with the applicable law and regulations, and that he could not afford relief for any differences between wage rates then prevailing in the area and the minimum rates required by the contract specifications.

13. Plaintiff protested this decision to the Chief of Engineers under date of July 10, 1941, and on August 5, 1941, plaintiff's appeal was denied by the Chief of Engineers in part as follows:

"There is no authority in law for this office to question the correctness of any determination made by the Secretary of Labor pursuant to the provisions of the above cited act [49 Stat. 1011]. Therefore, I find that the wage rates as established by the Secretary of Labor, and incorporated in the contract specifications, were the minimum wage rates applicable in the locality for the labor classifications anticipated to be used on the work."

14. Plaintiff under date of February 20, 1943, asked defendant to reconsider its appeal regarding minimum wage rates, and this was responded to by letter dated April 13, 1943, from the Chief of Engineers, in part as follows:

"A determination as to the accuracy of the specified wages is not necessary to a decision in this case. The contract by Article 17 and by paragraph

1-31 of the specifications provides that wages not less than those specified shall be paid. The contract makes no representation as to the availability of labor nor as to the actual wage scales that would be in effect. The alleged increased costs did not result from your contract obligation but from economic conditions which are ordinary contingencies contemplated under the terms of the contract. No reason has been shown which would warrant modification of the previous decision dated August 5, 1941."

15. Paragraph 1-12 of the Standard Government Form of Invitation for Bids, a copy of which was furnished to plaintiff, provides as follows:

"*Investigation of Conditions.*—Bidders are expected to visit the locality of the work and to make their own estimates of the facilities needed, the difficulties attending the execution of the proposed contract, including local conditions, availability of labor, uncertainties of weather, and other contingencies. In no case will the Government assume any responsibility whatever for any interpretation, deduction, or conclusion drawn from the examination of the site. At the bidder's request, a representative of the Government will point out the site of the proposed operations. Failure to acquaint himself with all available information concerning these conditions will not relieve the successful bidder of responsibility for estimating the difficulties and costs of successfully performing the complete work."

16. If plaintiff's president had investigated wage rates, he could have ascertained that the prevailing rate for carpenters was $1.125 per hour, and that the prevailing rate for unskilled labor was $.55 per hour, with an advance to $.625 per hour, effective as of April 1, 1941. Also, before inviting bids on this project, the District Engineer could have ascertained that the Secretary of Labor had made a new determination of the prevailing wage rates for Elmira on March 4, 1941.

17. Because plaintiff was required to pay $1.125 per hour to carpenters instead of $1 per hour, as shown in the bid proposal and contract wage schedule, its labor costs were increased $3,786.68. Similarly, plaintiff's labor costs for unskilled laborers and concrete puddlers were increased $3,576.54 as the result of the payment of the $0.55 per hour rate instead of the $0.50 per hour rate specified in the contract wage schedule. The total of these amounts, which includes plaintiff's increased payroll insurance and taxes, is $7,363.22.

Sheeting and Shoring.

18. The contract specifications provide in part as follows:

Section I.

"1-14. *Work Areas.*—* * *

(b) The contractor shall be responsible for trespassing upon, or damage to, public and private lands and roads, bridges, buildings, chimneys, and utilities in or adjacent to the work and access areas resulting from any act or omission on his part, including damage caused by disturbance of foundations while conducting any operation within the work area. The contractor shall take special precautions to prevent injury to existing structures while working in the vicinity of the Hygeia plant, Brand building, greenhouse, gas regulation house, private dwellings, and all other buildings and structures located at or close to the edge of the work area. He shall take similar precautions in the vicinity of the pole line crossing the levee at West Hudson Street, the water main at approximate Station 176+37, all power facilities at the Hygeia plant, and any other utilities which will not be relocated.

* * * * * *

"(d) The garage and other property of the Hygeia Refrigerating Company are within the work area, and the activities of this company will be carried on during construction of the project. The contractor shall cooperate with this company during all con-

struction operations in order to preserve its access and permit its operations to be conducted with a minimum of interference by the contractor. The contractor shall perform the necessary construction on the company's property in the least practicable time. He shall provide bracing or other protection satisfactory to the contracting officer for the garage wall against which the new wall is placed. The garage and other property within the work area shall be restored to a condition satisfactory to the contracting officer upon completion of the permanent work in that area.

\*    \*    \*    \*    \*    \*

"Section III

"3.03. *Excavation—Common.* \* \*

"*(b) Procedure.* (1) *General.* Excavation—Common shall be performed in accordance with subparagraph 3–01 (c). Excavation around bridge piers and abutments, existing walls, buildings, chimneys, transformers, power lines, utilities, sewers, culverts, and other existing structures shall be exeuted with all due precautions; satisfactory to the contracting officer, for safeguarding the structures. (See paragraph 1–14.) Where special work is required to prevent undermining existing structures, it shall be done in accordance with detailed plans prepared by the contractor and approved by the contracting officer, but such approval shall not relieve the contractor of responsibility for damages which may result from the failure of the temporary protection. Where excavation operations endanger the stability of existing or new structures, sheeting and shoring shall be installed at the locations indicated on the drawings or directed by the contracting officer. The contractor shall be responsible for the safety of such structures. (See subparagraph (3) below and paragraph 3–06.) \* \* \*

\*    \*    \*    \*    \*    \*

"(3) *Sewers, Culverts, and Drains.* —The contractor shall furnish and install sheeting and shoring in all trenches where the depth exceeds 6 feet. \* \* \*

\*    \*    \*    \*    \*    \*

"3–06. *Sheeting and Shoring.—(a) General.*—The contractor shall furnish and place such sheeting, shoring, bracing, or other approved supports as are indicated on the contract drawings or directed by the contracting officer for the protection of the worker or adjoining property. The right is reserved to order the installation of sheeting and shoring where its use is considered advisable for the safety of the work, and to require such sheeting and shoring to remain in place when its removal is considered inadvisable.

"*(b) Procedure.*—All sheeting and shoring shall be designed by the contractor and approved by the contracting officer prior to installation, but such approval by the contracting officer shall not relieve the contractor of sole responsibility for damages resulting from the inadequacy or lack of any sheeting and shoring. The sheeting and shoring shall be built to provide adequate clearances for minimum interference with construction operations, proper bracing for stability, and safe conditions around the work. If, in the opinion of the contracting officer, any methods or measures of the contractor constitute a hazard in any way or are otherwise improper or inadequate, the contracting officer will notify the contractor of that fact in writing. If the contractor fails to provide immediately such remedial measures as are deemed necessary by the contracting officer, such measures will be provided by the contracting officer at the expense of the contractor. When sheeting and shoring have served their purpose and their removal is approved by the contracting officer, they shall be removed and disposed of. Whether sheeting and shoring are removed or left in place, all cavities shall be adequately filled. When approved by the contracting officer, sheeting and shoring

may be used in lieu of excavation to full pay lines.

"(c) *Measurement.*—Sheeting and shoring will be measured by the square foot of protected area.

"(d) *Payment.*—Except as specified below, payment for all costs of furnishing and placing sheeting and shoring indicated on the contract drawings or directed by the contracting officer, and of its removal and disposal when not left in place, will be made at the contract unit price for "Sheeting (Including Shoring)," Item No. 7. Where sheeting and shoring are used at the contractor's option and with the approval of the contracting officer, separate payment will not be made for the sheeting and shoring, but payment will be made for excavation to the pay lines shown on the contract drawings as though the cut had been made to such pay lines."

19. The schedule of payments incorporated into the contract in suit provided in item 7 that the plaintiff was to be paid for sheeting (including shoring) on a quantity of 9,200 square feet at the rate of 65 cents per square foot, or a total of $5,980.

20. Section I, paragraph 1–05, provides in pertinent part as follows:

"1–05. *Quantities.*—The following estimate of quantities is given only to serve as a basis for comparison of bids and for determining the amount of consideration of the contract. Within the limits of available funds, the contractor will be required to perform the entire quantity of work necessary to complete the work specified in paragraph 1–02 hereof, be it more or less than the amounts herein estimated.

\* \* \* \* \* \*

"Item No. 7 Sheeting (Including Shoring) 9,200 Sq. Ft."

\* \* \* \* \* \*

21. As the work progressed, the plaintiff placed sheeting and shoring necessary for the protection of the work as well as that necessary for the protection of existing buildings and structures. Payment was made on account of such sheeting and shoring, as well as the other work performed by the plaintiff, on monthly estimates prepared by defendant's resident engineer and given to plaintiff's superintendent together with a payment voucher for execution on behalf of plaintiff. The plaintiff executed such payment vouchers and forwarded them along with each monthly estimate for payment by the defendant's paying office. On the second such monthly estimate forwarded with a payment voucher by plaintiff, an item of 438 square feet of sheeting, including shoring, appears under item 7. On subsequent monthly estimates supporting payment vouchers, under item 7 appears a figure covering additional sheeting, including shoring. The plaintiff accepted monthly payments on such payment vouchers without question as to the manner of computation of the sheeting (including shoring) item until the final estimate was received by the plaintiff showing a total of 10,152 square feet.

22. After all of the work under the contract had been performed, the defendant, through the resident inspector, forwarded proposed final estimate on January 21, 1943. On January 28, 1943, plaintiff's superintendent, Mr. Bernard Gabriel, went to the office of the District Engineer at Syracuse, New York, and conferred with a representative of that official concerning claims for additional payments on various contract items including sheeting and shoring. Following this conference, the plaintiff received a letter dated February 1, 1943, from the District Engineer in which it is stated that:

"In computing pay quantities the following methods were used by this office.

"Sheeting—Computations based on field measurements of length and height of sheeting placed."

23. The plaintiff was paid at the rate of 65 cents per square foot for 10,152.1 square feet of sheeting and shoring. Of this amount 6,738.2 square feet was for the protection of the work, and 3,413.9 square feet was for the protection of property. The plaintiff claims that it should have been paid for 32,899 square feet, 8,094 square feet for the protection of the work, and 24,805

square feet for the protection of property.

As to the sheeting and shoring required for the protection of the work, it is plaintiff's position that the protected area was the area of side walls of trenches excavated where sheeting was placed.

On many items concerning sheeting placed for protection of the work, the allowance was as great or greater than that claimed, except for 50 square feet of sheeting claimed at the Walnut Street Bridge, which the defendant allowed under sheeting placed for the protection of property. The evidence is not satisfactory as to the measurements by which either the amount claimed or allowed was computed.

As to the sheeting and shoring required for the protection of the property, plaintiff's claim is based not upon the amount of sheeting or shoring placed, but rather upon the ground area covered by the buildings and structures so protected. The ground area of the buildings and structures which was protected by sheeting and shoring is shown below:

*Ground area of buildings and structures as to which sheeting and shoring was provided*

| | | | |
|---|---|---|---|
| Brand Building .... | 175 x 68 | 11,900 | sq. ft. |
| Hygeia Wall....... | 315 x 6 | 1,890 | " " |
| Garage (Main St.). | 54 x 60 | 3,240 | " " |
| House (Connolly Ave.) .......... | 35 x 25 | 875 | " " |
| Florist Shop (Walnut St.) ......... | 30 x 30 | 900 | " " |
| Greenhouse (Walnut St.) ......... | 240 x 25 | 6,000 | " " |
| Total ............... | | 24,805 | " " |

24. The plaintiff on February 9, 1943, wrote to the District Engineer requesting that the defendant recompute the allowance for sheeting and shoring.

"* * * by ascertaining the square footage of the area protected by the work performed under this item, pursuant to paragraph 3–06 subdivision (c) and that we be paid therefor at the unit price of said item. * * *"

The defendant reviewed plaintiff's protests and on February 18, 1943, wrote plaintiff that the item had been measured and computed in strict accordance with the provisions of the contract specifications, and the contractor was invited to present additional facts or computations for consideration.

25. The plaintiff failed to accept this invitation but rather by letter dated February 24, 1943, returned a final release of claims wherein was listed an exception to the method of computing the final quantity of sheeting and shoring.

26. Receipt of the release was acknowledged by letter dated March 5, 1943, and the plaintiff was advised of his further rights of appeal under Article 15 of the contract.

27. On March 19, 1943, plaintiff appealed the decisions of the contracting officer to the Secretary of War, and on July 31, 1944, the appeal was denied. This denial reads in part as follows:

"You allege that the method used by the contracting officer in computing the pay quantities for sheeting (including shoring) was incorrect. Paragraph 3–06(c) of the contract specifications states that sheeting and shoring, '* * will be measured by the square foot of protected area.' The record shows that the pay quantities of sheeting placed adjacent to existing structures were determined by measurements to specific payment lines where such lines are shown on the drawings. Where specific payment lines were not indicated, the quantities were computed by using the length of the area actually sheeted and the difference in elevation between the top of the sheeting and the bottom elevation of the adjacent structures. The pay quantities for sheeting not placed adjacent to any existing structure were computed by multiplying the difference in elevation between the ground surface and the bottom elevation of the trench by the length of the area sheeted. You assert that because of the liability imposed by paragraph 1–14(b) of the specifications for damages to structures in or adjacent to the

work, including damages caused by disturbance of foundations, that the term 'protected area' as used in paragraph 3–06(c) must be construed to mean the ground area occupied by the adjacent structures and that the computation of pay quantities for sheeting placed to protect such structures must be based on the area thereof. As noted above the payment lines shown on the drawings for sheeting and shoring placed adjacent to the structures clearly indicate that the parties did not intend that payment should be made on the basis of the ground area of the buildings. Furthermore, the estimates [sic] pay quantity of sheeting was only 9,200 square feet, approximately 10% less than the quantity of 10,152 square feet for which payment was made and only about 30% of the quantity for which payment is claimed. The contract does provide, as contended by you, that the quantities specified are only estimates. However, the buildings which were to be protected were clearly indicated on the contract drawings. The combined ground area of the buildings alone, aside from the other locations where the plans indicated sheeting was to be placed, is about 2½ times the total area for which it was estimated sheeting would be required. The payment lines indicated on the drawing and the discrepancy between the ground area of the buildings and the estimated quantity of the sheeting should have put you on notice that the Government did not intend that the pay quantities of sheeting and shoring placed adjacent to existing structures would be computed on the basis of the ground area of such structures. No objection has been made of the method employed by the contracting officer in computing pay quantities for sheeting not placed adjacent to structures. As the ground area occupied by a structure has no direct relation to the cost of placing sheeting and shoring adjacent to it, there would appear to be no reason to compute the pay quantities of sheeting placed adjacent to such structures on the basis of the ground area occupied and to compute the pay quantities of sheeting not so placed on an entirely different basis. Under paragraph 1–14(b) of the specifications you are liable for damages to land as well as to structures. If your contention that the pay quantities of sheeting placed adjacent to existing structures must be computed on the basis of the ground occupied by said structures were to prevail, it would logically follow that the pay quantities for sheeting not placed adjacent to any existing structure should be computed on the basis of the land area protected, even though such area might conceivably comprise many acres. Such as [sic] interpretation is obviously absurd. It is my finding that the methods employed by the contracting officer for computing the pay quantities of sheeting and shoring were correct."

Concrete Finishing

28. Article 15 of the contract provides as follows:

"Article 15. *Disputes.*—Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed."

Section 1–20 of the general provisions of the contract specifications provides:

"1–20. *Claims, Protests, and Appeals.*—(a) If the contractor considers any work demanded of him to be outside the requirements of the contract or if he considers any action or ruling of the contracting officer or of the inspectors to be unfair, the contractor shall without undue delay, upon such demand, action, or ruling, submit his protest thereto in writing to the contracting officer, stating clearly and in

detail the basis of his objections. The contracting officer shall thereupon promptly investigate the complaint and furnish the contractor his decision, in writing thereon. If the contractor is not satisfied with the decision of the contracting officer, he may, within thirty days, appeal in writing to the Chief of Engineers, whose decision shall be final and binding upon the parties to the contract. Except for such protests or objections as are made of record in the manner herein specified and within the time limit stated, the records, ruling, instructions, or decisions of the contracting officer shall be final and conclusive.

"(b) The Chief of Engineers has been designated by the Secretary of War as his duly authorized representative to make final decision and to take other action where the terms of the contract require that such decision or action shall be 'by the Head of the Department concerned or his duly authorized representative.' All appeals from decisions of the contracting officer authorized under the contract shall, therefore, be addressed to the Chief of Engineers, U. S. Army, Washington, D. C. The appeal shall contain all the facts or circumstances upon which the contractor basis his claim for relief and should be presented to the contracting officer for transmittal within the time provided therefor in the contract."

Pertinent provisions of the contract specifications, Section VII, dealing with the subject "Concrete" are quoted below:

Section VII. Concrete

\*   \*   \*   \*   \*   \*

"7.03 *Proportioning and Mixing.*—
\* \* \*

"(b) *Proportioning.* \* \* \*

"(2) *Control.*—The exact proportions of all material entering into the concrete shall be as directed by the contracting officer. The contractor shall provide all equipment necessary to positively determine and control the actual amounts of all material entering into the concrete. The proportions will be changed whenever, in the opinion of the contracting officer, such change becomes necessary to obtain the specified strength and the desired density, uniformity and workability, and the contractor will not be compensated because of such changes, except for an increase in the specified minimum unit paste content, as provided herein as follows: In the event it is determined by the contracting officer that concrete of the desired quality cannot be obtained with the specified gradation of aggregates conforming fully to the specifications and the specified minimum unit cement content, he may direct an increase in the unit paste content by the addition of Portland cement, in which case compensation will be made therefor at the cost to the contractor of the cement delivered F.O.B. carrier at the site of the work, plus $0.40 per barrel.

\*   \*   \*   \*   \*   \*

"7–05. *Details of Construction.*—(a) *Forms.*—\* \* \*

(4) *Removal.*—Forms shall not be removed without the approval of the contracting officer, and all removal shall be accomplished in such manner as will prevent injury to the concrete. Forms shall not be removed from walls and vertical faces before the expiration of 2 days, except when specifically authorized by the contracting officer. When, in the opinion of the contracting officer, conditions on the work are such as to justify it, forms may be required to remain in place for longer periods.

\*   \*   \*   \*   \*   \*

"(d) *Finishing.*—Immediately following removal of forms all form tie holes shall be filled, protruding fins or other surface irregularities removed by carborundum stone and all other defects repaired. Where necessary to obtain a suitable surface finish, the contractor shall remove the forms and finish the surfaces when and as directed by the contracting officer at no additional cost to the United States. The curing specified in subparagraph 7–05 (e) following shall be temporarily sus-

pended during such repairing or finishing as directed. The finished surfaces shall be free from sand streaks or other defects and the plastering over of such surfaces will not be permitted. Defective concrete shall be repaired by cutting out the unsatisfactory material and placing new concrete which shall be formed with keys, dovetails, and anchors to attach it securely to the other work. This concrete shall be drier than the usual mixture and shall be thoroughly tamped into place. All surfaces of concrete, not covered by forms, that are not to be covered by additional concrete or backfill shall have a wood float finish without additional mortar, and shall be true to elevations as shown on contract drawings. Striking-off and finishing shall follow closely the placing operation in order to insure completion before the initial set has taken place. The contractor will not be permitted to start a pour unless a sufficient number of qualified finishers are available to fulfill the above requirements. Care shall be taken to see that all excess water is removed before making the finish. Other surfaces shall be brought to the specified finished elevation and left true and regular as approved by the contracting officer. Where considered necessary by the contracting officer, or where indicated on the drawings, joints shall be made carefully with a jointing tool. Every precaution shall be taken by the contractor to protect finished surfaces from stains or abrasions. No fire shall be permitted in direct contact with any concrete at any time. Concrete surfaces or edges likely to be injured during the construction period shall be properly protected by leaving the forms in place or by erecting covers satisfactory to the contracting officer."

29. Section 1, paragraph 1–11, *Work Covered by Contract Price,* provides as follows:

"1–11. *Work Covered by Contract Price.*—The contractor shall, under the contract prices, furnish and pay for all materials, equipment, and labor for all permanent, temporary, and incidental work, furnish all accessories, and do everything which is necessary to carry out the contract in good faith, which contemplates everything completed, in proper working order, of good materials with skillful workmanship, accurately fitted, properly assembled, and connected."

30. The placement of concrete began on August 20, 1941, and placement was made from time to time during that construction season until October 24, 1941. During this time monoliths Nos. 1 through 17 were poured. The first concrete which was placed above the foundation and as to which the plaintiff's claim for finishing relates was commenced on September 5, 1941.

31. From the time that the forms were stripped from the exposed concrete lifts above the foundation, the defendant's field representatives complained to Mr. Gabriel, plaintiff's superintendent, of the poor faces on the exposed concrete. After monoliths Nos. 1 through 17 had been poured and the forms stripped from the concrete, there were rust stains showing from the water pipes used in curing, and the concrete faces showed numerous blemishes, pockmarks, and honeycombs. Protruding fins had not been removed, and the form tie rod holes had not been filled.

32. Prior to October 29, 1941, defendant complained to plaintiff regarding the tie holes not being plugged as required by paragraph 7–05(d) of the contract specifications.

33. Under date of July 28, 1941, plaintiff transmitted to defendant some revised prints covering certain form details in the construction of the wall and which made reference to the proposed use of certain porcelain tubes or cylinders for the purpose of putting bolts through said porcelain cyinders which could act as spreaders and thereby increase or lessen the width of the forms.

34. Defendant, by letter dated August 4, 1941, approved plaintiff's revised prints subject to certain provisions which in part provided:

"(e) The approval as indicated above is predicated on producing a finished

concrete surface as contemplated in contract specifications, and the right is reserved to require necessary revisions in your form construction to provide uniform finished surfaces on all exposed faces."

35. On October 15, 1941, defendant objected to the further use by plaintiff of visible porcelain tubes which gave the appearance of an unfinished job.

36. Under date of November 15, 1941, defendant wrote plaintiff regarding the unused porcelain tubes and therein stated that plaintiff would be allowed to use these tubes on unexposed concrete wall surfaces and would be paid for the remaining unused porcelain tubes.

37. The defendant has allowed payment for porcelain tubes which were delivered by plaintiff to defendant but not used on the job.

38. On October 20, 1941, the contracting officer addressed and forwarded the following letter to the plaintiff:

"Reference is made to Par. 7–05(d), Finishing of Concrete Surfaces, of your Contract No. W–321–eng–261 for the construction of the Elmira Flood Protection Project, Section 1.

"I have examined the concrete work constructed to date under your contract and find that it has not been finished in accordance with the provisions of the contract specifications. You are directed to correct these deficiencies at once. My field representatives will indicate the defective work and furnish details of the required corrective measures."

39. By letter dated October 29, 1941, defendant's Resident Engineer forwarded a detailed statement of corrective measures to be taken by the contractor in two parts, the first relating to the treatment of monoliths Nos. 1 through 17 which had then been placed, and the second relating to the treatment of concrete which had not then been placed. The detailed statement of corrective measures provides as follows:

Method of Treating Existing Work

"The surface to be treated will be scrubbed with a wire brush where necessary to clean out defective areas.

"Mix one part portland cement with two parts fine sand (similar to that used on the project from which particles retained on the No. 16 sieve has been removed) with water sufficient to produce a grout having the consistency of very thick paint. If necessary, white portland cement shall be added, replacing an equal quantity of standard cement, in a quantity sufficient to give a color equal to the concrete in the project. A test of the procedure and color will be made on a panel which is to be covered with backfill. This mixture shall be carefully worked out so that no difference in color will result from the grout. This mixture shall be allowed to set for 45 minutes before being used. The surface of the concrete to be treated shall be thoroughy wet, after which the grout shall be applied with a brush or cloth completely filling air bubbles and holes. Immediately after applying the grout scour the wall vigorously with a cork or wood float. The grout shall then be allowed to set partially for an hour or two, depending on the weather, until it has hardened sufficiently so that it can be scraped from the wall with the edge of a steel trowel without removing the grout from the small air holes. Next allow the surface to dry thoroughly one to two hours or more depending on the weather until the initial set occurs and rub it vigorously with a burlap bag to completely remove any dried grout. There shall be no visible film of grout remaining after this rubbing. The entire cleaning operation for any monolith shall be completed the same day it is started. The entire exposed surface of the monolith shall be treated in this manner. If any dark streaks or spots remain after this operation they shall be rubbed lightly with a fine carborundum stone. This rubbing must be carefully done to avoid changing the texture of the concrete.

"After the grout has become thoroughly set (24 hours in warm weather

and 48 hours in cold weather) curing will commence and continue for at least seven days. Curing shall be accomplished by covering finished surfaces promptly with damp burlap or cotton quilts. (Heating will not be necessary on old walls.)"

Method of Treating New Concrete Work

"The forms on work that is to be exposed shall be removed as soon as it is possible to do so without injury to the concrete. In warm weather (minimum 65° F, average 75° F) this will be approximately 24 hours after the completion of placing. In colder weather the forms should be allowed to remain in place approximately 48 hours.

"Immediately after the forms have been removed all fins or other projections shall be broken off with a carborundum stone or other suitable tool which will remove the projections without marring the surrounding surfaces. Filling of form tie holes shall be concurrent with the removal of fins, etc. This operation shall be separate from general finishing and shall be accomplished with retempered mortar. This mortar shall have the same sand-cement ratio as the concrete in the original work. Sufficient water shall be added to make a dry mixture. This mortar shall be thoroughly mixed, allowed to set for one hour and then remixed before being used. The material shall be thoroughly tamped into the tie holes and care shall be taken not to smear or deface the surrounding surfaces. Other patching of honeycomb or similar defects shall also be accomplished with sand-cement mortar as described above. All patches shall bond with the steel reinforcement and shall, if feasible, be dovetailed to the existing work. Dish shaped patches with sloping sides shall not be permitted.

"Upon completion of repair work as outlined above, the entire exposed surface shall be treated as follows:

"A thing sand-cement mortar shall be applied to the entire surface with a steel trowel. This mortar shall be composed of one part cement and two parts sand to which water shall be added until the mortar has the consistency of very thick paint. If necessary, white cement shall be used replacing an equal quantity of regular cement so that the dry mortar will have the same color as the concrete in the structure. Panels shall be experimented with on concrete surfaces which will be covered in order to assure this similarity in color. This application shall be sufficiently vigorous to insure the complete filling of all pock marks or other blemishes. The sand for this mortar shall be the sand as regulaly [sic] used in the concrete work except that the sizes retained on a No. 16 sieve shall be removed. The mortar applied to the concrete surface shall be allowed to set for one hour and the surplus shall then be removed by scraping the surface lightly with the edge of a steel trowel or steel float. After the lapse of sufficient time to allow initial set or hardening of the mortar, the surface shall be vigorously rubbed with Clean Dry Burlap which shall entirely remove the mortar on the surface of the concrete. Initial curing shall be commenced immediately after this operation and shall consist of covering the finished surface with Clean Wet Burlap. Normal water curing will commence 12 hours later. Finishing of concrete surfaces shall be completed in the minimum possible time and in no case shall the finishing be extended over more than a 12 hour period. (This is specified because the color of the finished surface may vary with atmospheric conditions and make blending with adjacent finished surfaces difficult.)"

40. Upon receipt of the letter and its enclosure referred to in the foregoing finding, the plaintiff on October 31, 1941, addressed the following letter to the contracting officer:

"Receipt is acknowledged of your letter of October 29th relative to certain finishing which you desire us to do on the concrete already placed on this project. It seems wise at this time to

review briefly, for the record, the procedure which has previously taken place and which must therefore be responsible for the appearance of these concrete walls. Before reviewing this procedure, let me state that we are already proceeding to do as directed in your letter of October 29th, and that we will at all times proceed with any of your instructions, our desire, however being, of course, that we be protected insofar as the matter of reimbursement to us, for any expenses plus normal profit incurred in carrying out any such instructions, is concerned.

"The aggregates used in the Elmira work, gravel, sand, and cement, were all previously approved by your representatives and accepted for this work. The water is the same as that used by the people of Elmira for drinking water and has also been approved by your representatives. The characteristics of the mixture, insofar as the porportion [sic] of the component parts, was set by your representatives after exhaustive tests on their part. The form lining used was approved by your representatives and the forms themselves compare in construction very favorably as to strength, appearance, etc., with any used in the district, and this we have on the authority of the Acting Chief of Operations. We come, therefore, to the mixing and placing of the concrete, and at all times these procedures have been directly and completely under the control of your representatives. No latitude has been allowed us for the carrying out of any opposing ideas we may have had in this work, ideas which may or may not have secured a better result, but in any event we were not allowed to try them out. We must, therefore, in view of all the above, respectfully suggest that the responsibility for any result which may not appeal to you, does not lie on our shoulders.

"It is our understanding that costs are being kept by your representatives as well as by ourselves on the additional expense that is now accruing because of the finishing operations which you have directed, and that on the conclusion of these operations a satisfactory settlement will be reached to reimburse us for this expense. If this understanding is not in accordance with yours, we should appreciate being advised at once.

"Your consideration and advice on all the above will be appreciated."

41. After monoliths Nos. 1 through 17 were treated in accordance with the procedure outlined for existing work, the plaintiff submitted on November 27, 1941, a request for the payment of the sum of $864.07 covering the cost of such work. This sum resulted after an allowance of $111.75 had been deducted as the cost of filling form tie rod holes.

On December 10, 1941, the contracting officer by letter acknowledged receipt of the above letter and stated as follows:

"I find that the finishing treatment required on your job is well within the intent of paragraph 7–05(d), and I cannot consider additional payment for this work."

Following receipt of the above letter, Mr. Fred Davis, vice president of plaintiff, conferred with the District Engineer on December 15, 1941. After this conference, the plaintiff addressed the following letter to the contracting officer:

"As a result of a conference held this morning with the District Engineer, Mr. Samples, and myself, my understanding of the conclusions reached at this conference is outlined below.

"1. I understand that our company is not giving up any of our rights to future consideration of our claim for the cost of the treatment of the walls constructed during 1941 by reason of not appealing at this time the decision of the District Engineer outlined in his letter of December 10th.

"2. That consideration will be given to payment by the United States for any increase in our costs because of any change in the kind of aggregates composing the concrete mixtures or because of any change that may be prescribed in handling the concrete.

"3. That the treatment of the walls in the future will be modified, in that treatment will be required only on the land side of the walls except that at bridge approaches where treatment shall be on both sides of the walls for a distance of three or four monoliths from the bridge approach; such treatment shall immediately follow the removal of the forms and shall consist of rubbing the concrete with carborundun [sic] stone and brushing with a light coat of mortar if required. It will also, of course, be necessary for us to block the holes at the form tie rods.

"We would appreciate knowing as to whether your understanding is in general accordance with the above."

42. The contracting officer replied by letter of December 29, 1941, as follows:

"Reference is made to your letter dated December 15, 1941, regarding your understanding of conclusions reached at a conference in my office on December 15, 1941, on concrete construction at the Elmira Flood Protection Project, Section No. 1, Contract No. W–321–eng–261.

"Using the same numerical index as used in your letter you are advised that conclusions reached in the conference were as follows:

"1. Your right of appeal from my decision on payment for wall treatment is established in Article 15 of the contract.

"2. Any redesign of concrete mixtures or required changes in methods of handling concrete not within the scope of specifications which causes increased cost will be cause for consideration of increased payments to you.

"3. Treatment of walls will be required on the landside of all walls and on the streamside of walls approximately 100 feet upstream and downstream of all bridges, approaches, or other similar places where relatively close scrutiny is easily attained. In addition to the above treatment regular patching of tie rod holes, replacing un-

satisfactory spots, repair of honeycombs, etc., will be required on all surfaces in accordance with specification requirements."

43. On February 9, 1943, the plaintiff filed a protest with the contracting officer listing five items of claim but not including the claim for concrete finishing. This was. relied to by letter of February 18, 1943, by the contracting officer, in which the following statement is made:

"In view of the fact that your letter and this reply are repetitions of previous protests and decisions, and that no progress is apparent in the settlement of this dispute, it is suggested that, in event you elect to prosecute this matter further, you arrange to present detailed facts, computations, etc., either by letter or at a conference in this office."

On February 24, 1943, the plaintiff forwarded an executed copy of a release dated February 19, 1943. In this release, the plaintiff excepted a claim by reason of concrete finishing operations

" * * * in a manner and to an extent not required by the contract plans and specifications. * * * "

The plaintiff suggested in the letter transmitting the release that $100 be withheld from payment due it on its final estimate. In this letter the plaintiff also discussed the concrete finishing claim and protested the sums allowed for the concrete items in the final estimate and requested an opportunity to submit detailed data as to the cost of performing this "additional" work.

44. The contracting officer on March 5, 1943, sent the following letter to plaintiff:

"Receipt is acknowledged of your letter dated February 24, 1943, transmitting executed copies of standard release form for Contract No. W–321–eng–261, and an application for reconsideration of a previous appeal, addressed to the Chief of Engineers, relative to minimum wage rate.

"Reference is made to the exceptions. listed in your formal release to Contract No. W–321–eng–261, and you are advised, as follows, as to the action tak-

en by this office relative to the various claims.

"(a) The decision relative to additional payment for work in connection with treatment of concrete surfaces, was given in letter from this office dated December 10, 1941. Reference is made to letter from this office dated December 29, 1941, informing you of your right to appeal the decision of this office as established in Article 15 of the contract. As no appeal was made as per Article 15 of the contract, it is considered that your right to appeal has been forfeited.

"(b) A decision relative to the other exceptions to the release; namely, payment of Sheeting (Including Shoring) Contract Item No. 7; payment of Copper, Contract Item No. 28, and payment of Contract Item No. 6, Removal— Walls, Slabs, Paving, Building Foundations (Concrete or Masonry) was given in letter from this office dated February 18, 1943.

"Your right of appeal from my decision on payment of the items covered in paragraph (b) above is established in Article 15 of the contract. The time allowed for appeal will expire thirty days from date of this letter.

"You are further advised that a voucher is being prepared for your signature for the partial estimate now due, less $100.00, as requested in your letter of February 19, 1943."

45. The plaintiff on March 19, 1943, appealed the decision of the contracting officer of February 18, 1943, and claimed in addition to the sheeting and shoring item and other items not here material, a concrete finishing item of $7,082.74 of which $862.42 was claimed for the finishing of monoliths Nos. 1 through 17 as to which the detailed statement of corrective measures related to the Method of Treating Existing Work, and $6,220.32 was claimed for the finishing of all other work as to which finishing was performed pursuant to the Method of Treating New Concrete Work contained in such detailed statement.

The contracting officer on June 2, 1943, forwarded his findings of fact on the plaintiff's claim to the Chief of Engineers. So far as here material, this finding of fact provides as follows:

"4. With reference to finishing concrete surfaces (paragraph 3a above), the contractor was required, in accordance with the contract specifications, to finish exposed concrete wall surfaces. The contractor offered verbal and written protests all of which were duly considered prior to the District Engineer's decision dated December 10, 1941 (Exhibit F), which denied the contractor's request for additional payment. After a conference in the District Engineer's office on December 15, 1941, the contractor forwarded the letter of the same date which he quotes on page 8 of his appeal. The District Engineer in turn with letter dated December 29, 1941 (Exhibit G), replied to the contractor's letter of December 10, 1941, and denied his request for additional compensation. The contractor was advised of his further rights of appeal under Article 15 of the contract. Records of this office do not disclose any further correspondence on this item of complaint prior to receipt of the final release (Exhibit Q), which was returned with letter dated February 24, 1943 (Exhibit D)."

On April 29, 1944, the contracting officer forwarded a supplement to his findings of fact dated June 2, 1943, to the Chief of Engineers. It provided as follows:

"1. The following facts concern that portion of the contractor's appeal pertaining to the finishing of concrete surfaces and is supplementary to the facts presented in paragraph four of Findings of Fact, dated 2 June 1943.

"2. Operations under the subject contract were commenced on 3 June 1941. Placement of concrete commenced on 19 August 1941 and a total of 955 cubic yards of Class A concrete, Item 20, was placed through 24 October 1941, the date concrete operations were suspended for the winter season. During the first season the contractor after the removal of forms did not attempt to patch holes or remove surface ir-

regularities from the exposed concrete surfaces as required by paragraph 7-05d of the contract specifications. The District Engineer on 15 October 1941 inspected the site of the work and verbally directed that immediate action be taken to remedy the unsightly condition presented by the unfinished concrete surfaces. The contractor was formally directed by letter dated 20 October 1941 (attached as Inclosure No. 1) to correct the surface deficiencies in a manner to be indicated by the resident engineer. The resident engineer by letter dated 29 October 1941 (see page 10 of contractor's appeal) furnished the contractor a complete set of instructions for the guidance of the contractor. Two procedures were outlined: the first pertained to finishing concrete placed and cured under the contract prior to the issuance of said instructions, the second procedure outlined a more timely method of finishing to be applied on subsequent work. The contractor complied with the instructions as outlined and by letter dated 27 November 1941 (attached as Inclosure No. 2) presented a bill in the amount of $864.07 for finishing 5,330 sq. ft. of concrete surface. The District Engineer by letter dated 10 December 1941 (Exhibit F of Findings of Fact) denied the contractor's request for additional payment on the grounds that the work performed was within the intent of the specification. The subsequent history is as outlined in paragraph 4 of the original Findings of Fact dated 2 June 1943."

46. Thereafter on June 19, 1944, the plaintiff filed with the Chief of Engineers a memorandum in further support of its appeal.

47. The Acting Chief of Engineers by letter of July 31, 1944, forwarded to plaintiff his decision denying the plaintiff's appeal which provided in pertinent part as follows:

"You claim additional compensation in the amount of $7,082.74 for finishing concrete in a manner allegedly not required by the contract specifications. It is not now contended by you that an appeal was taken within thirty days from the date of the contracting officer's decision denying your claim in the amount of $862.42 for finishing concrete erected in 1941 as required by paragraph 1-20 of the contract specifications. Thus further consideration of this item is precluded. In regard to the item of $6,220.32 for finishing concrete erected in 1942, the only question involved is whether instructions issued by the Contracting Officer for said work exceed the requirements of the contract. An examination of the applicable provisions of the specifications and the instructions issued by the contracting officer clearly show that the claim for this item was properly denied. Paragraph 7-05(d) of the specifications requires you to finish the concrete surfaces, '* * * as directed by the contracting officer * * *' without any compensation in addition to that provided in the contract unit prices for concrete. This provision does not obligate you to comply with arbitrary instructions issued by the contracting officer. It does require you, however, to comply with any reasonable instructions of the contracting officer and to finish the concrete in a sightly and workmanlike manner. The instructions issued by the contracting officer for finishing 'new concrete work' are reasonable and represent the minimum requirements for a workmanlike job. Your appeal for additional compensation for finishing concrete is therefore denied.

A reconsideration of the appeal was thereafter requested on behalf of the plaintiff and on October 1, 1946, the Chief of Engineers reaffirmed the action by the Acting Chief of Engineers of July 31, 1944, referred to above.

48. The plaintiff appealed the decision of the Chief of Engineers to the War Department Board of Contract Appeals. The president of this Board on January 10, 1947, as the authorized representative of the Secretary of War, dismissed the appeals following the decision of the Board which

found that it had no jurisdiction to entertain them.

49. On monoliths Nos. 1 through 17, 5,330 square feet of concrete surface was treated in accordance with the direction of the contracting officer. The plaintiff by its letter of November 27, 1941, claimed a total of $864.07 for such surface treatment, itemized as follows:

### Labor

Oct. 27/41 to and incl. Nov. 18/41

| | | | | | |
|---|---|---|---|---|---|
| 124 Hrs. | @ | $1.50 | per Hr. | | $186.00 |
| 127 " | @ | 1.25 | " " | | 158.75 |
| 522.5 " | @ | 0.75 | " " | | 391.87 |
| 20 " | @ | 1.87 | " " | | 37.40 |
| 5 " | @ | 2.25 | " " | | 11.25 |
| 6 " | @ | 0.80 | " " | | 4.80 |
| 4 " | @ | 1.125 | " " | | 4.50 |
| 4 " | @ | 1.125 | " " | | 4.50 |

Total labor ................. 794.57
Less clean and plug form tie rod holes, 149 hrs. @ $0.75 per hr...—$111.75

Balance due a/c labor............ 682.82
Rent of scaffold (swinging)...... 18.00
Material of built scaffold........ 15.00
2 carborundum stones .......... 2.50
2 trowels ..................... 1.70
3 wire brushed [sic]............ 1.80
2 plaster brushes ............... 2.10
2 bags cement ................. 1.19
1 bag cement (white) ........... 2.50
0.2 ton sand .................. .40
Compension [sic] and other insurances @ $8.423 per hundred dollars of payroll ............... 57.51

Total labor, material and accessories .............. 785.52
10% on the above to allow for overheads and profit .............. 78.55

Total ................... 864.07

No proof of damages relating to the claim was made other than the claim itself.

50. The plaintiff claims as the extra cost to it of the concrete finishing during 1942, in accordance with the directions of the contracting officer relating to new work, the sum of $6,070.19 itemized as follows:
Labor ....................... $5,934.64
Material ..................... 100.00

Small tools .................... .50.00
Compensation, P. L. & P. D., $7.24 per H. of P. R........... 429.67
State Unemployment, 2.7% ..... 160.24
Social Security, 1% ........... 59.35

Total ..................... 6,733.90
Profit, 10% ................... 673.39

Total ..................... 7,407.29
Chargeable to work as called for in the Specifications, 27,944 S. F. @ $0.05 per S. F., incl., all insurances, bond, profit, etc.... 1,397.20

Balance ................... 6,010.09
Bond ....................... 60.10

Total Claimed, 1942 ........ 6,070.19

It is noted that in the computation above a credit of five cents per foot is allowed by plaintiff as the cost which it feels is properly chargeable to it for the finishing according to the contract specifications.

Excepting such credit shown, the entire claim is based upon labor cost and other costs in turn based upon the cost of labor with the further exception of $150 for material and small tools. Since as the secretary of the plaintiff testified, certain original payroll records have been lost due to some cause beyond his knowledge, it is not possible to verify the extra cost of concrete finishing in 1942 relating to new work.

### Conclusion of Law

Upon the foregoing special findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States seven thousand four hundred sixty-three dollars and twenty-two cents ($7,463.22).

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

WHITAKER, Judge.

Plaintiff brings this suit to recover under its contract with the War Department Corps of Engineers for the construction of

a flood fall along the Chemung River in Elmira, New York. Plaintiff presents three claims as follows:

Claim for reimbursement of wage rates paid to carpenters, laborers, and concrete puddlers $15,597.38

Claim regarding measurement of sheeting and shoring......... 14,785.55

Claim for finishing of concrete.. 6,934.26

Total .................... 37,317.19

Plaintiff's first claim is that it was misled by defendant as to the wages it would be required to pay in carrying out the contract. Briefly stated, the facts anent this controversy are these:

On March 29, 1941, plaintiff received from the Binghamton, New York, District office of the Corps of Engineers an invitation to bid upon the construction of Section 1 of the Elmira Flood Protection Project. Plaintiff submitted a bid which defendant accepted on May 14, 1941. Formal notice to proceed was issued on June 5, 1941.

The Standard Government Form of Invitation to Bid contained the following provision:

"*Investigation of Conditions.*—Bidders are expected to visit the locality of the work and to make their own estimates of the facilities needed, the difficulties attending the execution of the proposed contract, including local conditions, *availability of labor*, uncertainties of weather, and other contingencies. * * * Failure to acquaint himself with all available information concerning these conditions will not relieve the successful bidder of responsibility for estimating the difficulties and costs of successfully performing the complete work." (Italics supplied.)

However, the contract specifications attached to the Invitation for Bids contained the following provision:

"1–31. *Wage and Labor Provisions.* (a) The Secretary of Labor has determined the minimum wage rates applicable in the locality for the labor classifications anticipated to be used on the work. In accordance with Article 17 of the contract, employees at the site shall be paid not less than these wages as listed below:

| Designation | Wage rate—hourly |
|---|---|
| Carpenters, Journeymen........ | $1.00 |
| *     *     *     *     *     * | |
| Laborers, unskilled............. | 0.50 |
| Laborers, Concrete Puddlers.... | 0.50 |
| *     *     *     *     *     * | |

This minimum determination had been made by the Secretary of Labor on January 31, 1941, at the request of the Corps of Engineers preparatory to including it in the Invitation for Bids for this contract. Such a determination was required by the Davis-Bacon Act of August 30, 1935, 49 Stat. 1011, 40 U.S.C.A. §§ 276a, 276a–1.

However, at the time defendant issued the invitation for bids on March 29, 1941, and included therein the foregoing specifications relative to wage rates, the Secretary of Labor had since issued a new determination of the prevailing wage rates for Elmira. This was furnished to the Public Buildings Administration on March 4, 1941. In this it was said that the prevailing wage rates were as follows:

| Classification | Hourly rate |
|---|---|
| Carpenters, Journeymen .......... | $1.125 |
| Laborers, unskilled .............. | 0.55 |

This was not communicated to the Corps of Engineers, but the District Engineer was informed by the labor union as early as October 22, 1940, that a $.125 per hour increase for carpenters would take effect on January 1, 1941. Despite this knowledge, the District Engineer before inviting bids on March 29, 1941, did not attempt to ascertain whether or not the Secretary of Labor had made a redetermination of the prevailing wage rates since his determination of January 29, 1941. Had he done so he would have learned of the determination of March 4, 1941.

Prior to the submission of its bid, plaintiff did not attempt to make an independent investigation of the prevailing wage scale for the classes of labor to be utilized on this contract, but it computed its bid in reliance upon the schedule of minimum wage rates contained in the specifications furnished.

When work on the project was started on June 3, 1941, plaintiff was unable to obtain

workmen for the rates specified, but had to pay the prevailing union rate of $.625 per hour for unskilled laborers, including concrete puddlers, and $1.125 per hour for carpenters. The rate for carpenters was put into effect on January 1, 1941. Prior to the Invitation for Bids the rates for common laborers had increased from $.50 to $.55, and on April 1, 1941, they had risen to $.625.

Plaintiff promptly notified the District Engineer, the contracting officer, that the minimum wage rates set forth in the contract specifications were less than the currently prevailing rates, but plaintiff was informed by the District Engineer on June 27, 1941, that the minimum wage rates had been determined in accordance with the applicable law and regulations, and, consequently, that he could not grant any relief. Plaintiff appealed this decision to the Chief of Engineers on July 10, 1941. This appeal was denied by the Chief of Engineers on August 5, 1941, principally on the ground that he lacked authority in law "to question the correctness of any determination made by the Secretary of Labor pursuant to the provisions of the above cited act [49 Stat. 1011]."

Following the completion of this project in December 1942, plaintiff on February 20, 1943, requested the Chief of Engineers to reconsider his action in dismissing its appeal of July 10, 1941. On April 13, 1943, the Chief of Engineers declined to change his earlier decision stating (1) that the contract made no representation as to the actual wage scales which would be in effect, and (2) that the increased costs did not arise from plaintiff's contract obligations but from economic conditions which were ordinary contingencies contemplated under the terms of the contract.

The specifications furnished to plaintiff in connection with the invitation to bid specified the minimum wages to be paid in accordance with the determination of the Secretary of Labor. This determination was made by him pursuant to the requirements of the Davis-Bacon Act, supra, which required him to determine the minimum wages to be paid "based upon the wages * * * determined * * * to be prevail-

ing" in the locality. His determination, therefore, so far as plaintiff's rights are concerned, amounted to a determination of the prevailing wage. When made, his determination was correct, but before bids were invited, wages had gone up and he had made a new determination. Thus, when the Corps of Engineers represented that the Secretary of Labor had determined the prevailing wage rates to be $.50 and $1, this was a misrepresentation, although an unintentional one. Nevertheless, it was one upon which plaintiff was entitled to rely.

It was a positive representation, and, therefore, one from the consequences of which the defendant cannot be relieved because of the provision requiring the contractor to investigate "the availability of labor." When defendant made this representation it assumed responsibility for its accuracy.

The fact that such a determination had been made some months before bids were requested does not relieve defendant. Plaintiff was entitled to rely on it as the Secretary's *latest* determination—as a representation of the wages it would have to pay when the work was to be done.

The District Engineer had been advised by the union months before the Invitation for Bids was issued that the rate for carpenters would be increased effective on January 1, 1941. Before issuing the invitation he should have made certain that the rates in effect were those he was representing them to be.

Plaintiff, therefore, is entitled to recover the difference between the wages specified in the Invitation for Bids ($.50 and $1.) and those which the Secretary of Labor determined on March 4, 1941 to be the prevailing wages ($.55 and $1.125). Albert & Harrison, Inc., v. United States, 68 F.Supp. 732, 107 Ct.Cl. 292, certiorari denied, 331 U.S. 810, 67 S.Ct. 1199, 91 L.Ed. 1830. In Irwin & Leighton v. United States, 115 Ct.Cl. 18, 32, the Court held that there was no misrepresentation. It did not intend to hold and did not hold that had there been a misrepresentation plaintiff could not recover.

Plaintiff urges that an additional misrepresentation took place following the issu-

ance of invitations to bid and prior to the acceptance of plaintiff's bid when the District Engineer failed to obtain from the Secretary of Labor an amendment of the contract wage schedule to reflect the increase from $.55 to $.625 obtained by the union for unskilled laborers and concrete puddlers on April 1, 1941. However, plaintiff has failed to establish any of the circumstances surrounding this increase, so that it is impossible to determine whether the District Engineer knew or should have known of its existence at the time he awarded this contract to plaintiff. Furthermore, the evidence does not reveal that the Secretary of Labor made a wage determination recognizing this rate prior to the acceptance of plaintiff's bid. In the absence of such proof there is no foundation for the claim that the District Engineer misrepresented to plaintiff the existence of this additional increase.

Plaintiff's next claim is that defendant incorrectly computed the amount due for "sheeting and shoring."

The construction of the new flood wall necessitated much trench excavation, both in open unimproved areas and also in close proximity to six buildings adjacent to the project site. In order to maintain safe working conditions and in order to furnish adequate lateral support for the adjoining structures, the contract called for the installation of an estimated quantity of 9,200 square feet of sheeting and shoring. It provided that plaintiff was to receive $.65 per square foot for the quantities actually installed to be measured by the "square foot of the protected area."

Plaintiff accepted, without protest, monthly payments for this work based upon the estimates of the defendant's resident engineer, but, when on completion of the project the Government's final estimate of the sheeting and shoring installed was substantially less than plaintiff's computation, plaintiff protested and requested information as to the method used by the Government in obtaining its total. Plaintiff was advised that of the 10,152.1 square feet of sheeting and shoring contained in the Government's final estimate, 6,738.2 square feet were for the protection of the work (trenches) and 3,413.9 square feet were for the protection of adjacent property.

Plaintiff disagreed with this computation and on February 9, 1943, wrote to the District Engineer requesting a recomputation. The District Engineer denied this request, saying that the measurements had been made in strict accordance with the provisions of the contract specifications. Plaintiff on March 19, 1943, filed an appeal with the Secretary of War, but the Secretary of War denied plaintiff's appeal, stating in part as follows:

"* * * The record shows that the pay quantities of sheeting placed adjacent to existing structures were determined by measurements to specific payment lines where such lines are shown on the drawings. Where specific payment lines were not indicated, the quantities were computed by using the length of the area actually sheeted and the difference in elevation between the top of the sheeting and the bottom elevation of the adjacent structures. The pay quantities for sheeting not placed adjacent to any existing structure were computed by multiplying the difference in elevation between the ground surface and the bottom elevation of the trench by the length of the area sheeted. * * * *"

Plaintiff agrees with defendant's method of computation of the shoring for the protection of the work, but says that the computation was in error.

In many decisions both this court and the Supreme Court have held that under contracts similar to the one in this case, the decision of the contracting officer on the amount of work done is conclusive. See e. g. Beuttas (B–W Construction Co.) v. United States, 60 F.Supp. 771, 101 Ct.Cl. 748, 768, reversed on other grounds, 324 U.S. 768, 65 S.Ct. 1000, 89 L.Ed. 1354; Penker Construction Co. v. United States, 96 Ct.Cl. 1; United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154.

As to the computation for the protection of the buildings adjacent to this project, plaintiff urges that under the terms of the specifications, which provided that sheeting

and shoring would be measured by the "square foot of the protected area," the District Engineer should have computed the pay quantities on the basis of the *ground area* of the buildings and structures so protected, that is to say, if the building to be protected had a total area of 100' x 50', **it** should be paid for 5,000 square feet. Defendant computed the amount by taking the difference between the "top of the sheeting and the bottom elevation of the adjacent structures."

We must, therefore, determine the meaning of the term "protected area" as used **in** the specification. The decision of the District Engineer upon this question is not final. Bell Aircraft Corp. v. United States, 100 F.Supp. 661, 120 Ct.Cl. 398, certiorari granted, 343 U.S. 913, 72 S.Ct. 646; McWilliams Dredging Co. v. United States, 118 Ct.Cl. 1; W. E. Callahan Construction Co. v. United States, 91 Ct.Cl. 538.

Both sides have offered expert testimony to aid the court in determining the meaning of this term. It shows that the purpose of this sheeting and shoring was to replace the natural support removed in the course of excavation. The ground area of a structure from which a portion of the natural support has been removed does not appear to have any reasonable relationship either to the amount or to the cost of providing the substitute support. Rather, the "protected area" is the area of the surface laid bare by excavation, such as the foundation wall of a building next to which sheeting is placed. Defendant computed it on this basis. Plaintiff is not entitled to recover upon this cause of action.

Plaintiff's next claim is on defendant's requirements for the finishing of the concrete.

The contract specifications contained detailed instructions as to the manner in which the concrete was to be mixed, placed, cured and finished. Paragraph 7–05(d) of the specifications provided:

"(d) *Finishing.*—Immediately following removal of forms, all form tie holes shall be filled, protruding fins or other surface irregularities removed by carborundum stone and all other defects repaired. Where necessary to obtain a suitable surface finish, the contractor shall remove the forms and finish the surfaces when and as directed by the contracting officer at no additional cost to the United States. The curing specified in subparagraph 7–05 (e) following shall be temporarily suspended during such repairing or finishing as directed. The finished surfaces shall be free from sand streaks or other defects and the plastering over of such surfaces will not be permitted. Defective concrete shall be repaired by cutting out the unsatisfactory material and placing new concrete which shall be formed with keys, dovetails, and anchors to attach it securely to the other work. This concrete shall be drier than the usual mixture and shall be thoroughly tamped into place. * * *"

When the forms were stripped from monoliths Nos. 1 through 17 an unsightly and unsatisfactory surface condition was revealed. Portions of the surface were stained with rust from the water pipes used in curing. Other areas showed numerous honeycombs, air bubbles, and pockmarks. Defendants' resident engineer called these conditions to the attention of plaintiff's superintendent and directed him to finish these surfaces in the manner he said was required by the contract specifications. These instructions were disregarded until on October 20, 1941, the contracting officer directed the following letter to plaintiff:

"Reference is made to Par. 7–05 (d), Finishing of Concrete Surfaces, of your Contract No. W–321–eng–261 for the construction of the Elmira Flood Protection Project, Section 1.

"I have examined the concrete work constructed to date under your contract and find that it has not been finished in accordance with the provisions of the contract specifications. You are directed to correct these deficiencies at once. My field representatives will indicate the defective work and furnish details of the required corrective measures."

Thereafter, on October 29, 1941, defendant's resident engineer furnished plaintiff with a detailed statement of the corrective

measures which were to be taken, which required plaintiff, among other things, to remove all protruding fins, cut out and patch honeycombs, fill the form tie rod holes, and then place over the entire surface a thin coat of mortar composed of sand and white portland cement.

On October 31, 1941, plaintiff replied to the District Engineer stating that it would carry out such instructions subject to its right to recover the resulting additional expenses. After finishing the surfaces of monoliths Nos. 1 to 17 in accordance with these instructions, plaintiff, on November 27, 1941, submitted a request to the District Engineer for the payment of $864.07 to cover the cost of this portion of the work. The District Engineer on December 10, 1941, denied plaintiff's request because, he said, the finishing treatment was required by the specifications. Plaintiff's additional claim of $6,070.19 for the costs of finishing the surface of concrete placed in 1942 was denied on the same grounds, as were plaintiff's subsequent appeals.

 We think the District Engineer's decisions were correct. While the original contract specifications indicated in a general way the results to be obtained, they did not specify in detail any particular method to be used by the contractor in obtaining a suitable surface finish. It was thus necessary and proper for the District Engineer, upon whom, as contracting officer, responsibility for the satisfactory performance of this project was placed, to direct the issuance of instructions supplementing, where necessary, the original specifications. Barlow v. United States, 35 Ct.Cl. 514.

Paragraph 7–05(d) of the specifications required that the finished surface of the concrete "shall be free from sand streaks or other defects" and it prohibited "the plastering over of such surfaces." It also provided:

"* * * Where necessary to obtain a suitable surface finish, the contractor shall remove the forms and finish the surfaces when and as directed by the contracting officer at no additional cost to the United States. * * *"

No more was required of plaintiff than was justified by the specifications.

In addition to the $100 which the United States withheld from the final payment made to plaintiff, and which the United States concedes to be due and owing, plaintiff is entitled to recover $7,363.22, making a total of $7,463.22.

It is so ordered.

JONES, C. J., and HOWELL, MADDEN and LITTLETON, JJ., concur.