MASSMAN CONST. CO. v.
UNITED STATES.

No. 45765.

Court of Claims.

Jan. 8, 1945.

Writ of Certiorari Denied May 28, 1945.
See 65 S.Ct. 1403.

636

Temple W. Seay, of Washington, D. C. (Phil D. Morelock, of Washington, D. C., on the brief), for plaintiff.

Grover C. Sherrod, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

MADDEN, Judge.

The plaintiff sues for $88,000 which, it claims, should be added to the price written in a formal contract which it made with the United States, because the plaintiff, by mistake, omitted an item of $88,000 when it computed its bid for the contract.

On October 23, 1940, the United States Engineer Office, New Orleans, Louisiana, advertised for bids for repairing the rubble-mound East jetty at Calcasieu Pass, Louisiana. Bids were to be opened November 7, at 2 P. M. Alternate (b) of the invitation was the one on which the contract here in question was awarded and it provided, as shown in finding 2, for furnishing all labor and materials except stone, which was to be furnished by the Government, for repairing and extending the jetty.

The plaintiff's home office was in Kansas City, Missouri. It had been in the contracting business for 25 years, and for 15 years its work had been principally on contracts with the Army Engineers, the contracts having amounted to some $60,000,000. When the plaintiff learned of the advertisement for the jetty project, it was about to complete other work where it had equipment suitable for the jetty job. George E. Owens, its general superintendent and chief estimator was away from Kansas City and returned there about November 4. It was decided that a bid would be made on the jetty job, and that Owens should go to New Orleans and there, after inquiry about local wage rates, fuel costs, freight rates, etc., prepare the bid.

Owens arrived in New Orleans on the morning of November 6, the day before the opening of bids. Since he needed no additional information about the value of the use of the plaintiff's own equipment on the job, he first listed on an estimate sheet the items of equipment, the value of the use of

each piece per month, and the number of months it would be used. From these figures he computed and recorded on the sheet the value of the use of the machinery and equipment for the job as $88,000. This sheet is copied in finding 7. Owens spent the rest of November 6 gathering local information, and he then on a second sheet estimated the costs of labor in placing stone, supervision, fuel, insurance, and other miscellaneous matters. On a third sheet he estimated the labor costs of towing and unloading. He finished these sheets after midnight on November 6 and gathered up his scattered papers and put them in a brief case, intending to make up his final estimate and the plaintiff's formal bid on the next morning.

On the morning of November 7, Owens, in taking the papers out of his brief case to complete his work, failed to take out the first sheet prepared by him the day before, on which sheet he had set down the items of value of the use of equipment amounting to $88,000. He therefore, in his final computation, as shown in finding 9, omitted that amount from consideration, and the bid which he submitted was lower by that amount than it would have been but for that omission. He filed the bid shortly before 2 P. M. on November 7, and it and three other bids were opened and read at that hour, as was the Government's own estimate of the cost of the work.

The bids and the Government's estimate are shown in finding 12. As explained in that finding, the Government's estimate included items which would not have been included in a contractor's bid, so its estimate, on a basis comparable to that of the bidders, would have been about $400,000, as against the plaintiff's bid of $367,000. The three bids by other contractors were much higher, being $620,400, $798,600, and $935,-000. The District Engineer and his assistant, who were in charge of the opening of bids, had no thought that plaintiff's bid involved a mistake. They talked to Owens about when the work would be started, whether plaintiff's equipment was adequate and other relevant matters. Owens felt that for some reason his bid was too low, but thought he had used poor judgment in his estimates. He said nothing to the Governmental officials, however, about his feeling that there might have been a mistake.

The way in which the mistake in the bid had been made was not discovered by the plaintiff until November 18. The manner of its discovery is recited in finding 15.

Upon its discovery the plaintiff wrote the Engineer Office at New Orleans. See finding 16. It requested that its bid be increased by $88,000, or be rejected without any liability on the bid bond. The District Engineer merely acknowledged this letter, on November 25, and on December 18 wrote the plaintiff accepting its bid as made, denying its request to change its bid and saying:

"You are advised that you have the right to file a claim with the District Engineer for submission through channels to the Comptroller General for further consideration."

The contract and bonds were enclosed for signature by the plaintiff.

The plaintiff considered the advisability of refusing to sign the contract. One of the principal reasons why it did not refuse was that refusal might affect its future relations with the Government agencies with which, as we have seen, most of its business had been done for some years past. Another reason was the fact that it had put up a bond guaranteeing its bid. It was also hopeful that if it filed a claim, as the District Engineer had written that it might, the claim would be allowed.

About December 28, 1940, the plaintiff signed the contract, furnished the requisite bond, and forwarded these to the District Engineer, together with a protest, the text of which is quoted in finding 19, and a letter to the Comptroller General. The contract was approved by the Division Engineer January 8, 1941. The plaintiff's letter to the Comptroller General recited the facts concerning the mistake substantially as we have found them, and asked that it be compensated for the use of its equipment, the value of which use it had not included in its bid.

The plaintiff's officials had conferences with officials of the Corps of Engineers, and submitted affidavits and information to them. The Corps of Engineers forwarded the plaintiff's letter to the Comptroller General on June 13, 1941 with a letter, a part of which is quoted in finding 20, saying there was doubt whether a mistake had been made, and that the estimate was prepared "in an extremely careless manner." It further said:

"It is thought that it would not be unconscionable to require the contractor to perform the work at its bid price. The present record does not establish that the contractor would incur a loss in performing

at the contract price. It is recommended that the claim be disallowed."

The Comptroller General disallowed the claim. The plaintiff performed the contract and was paid the contract price, except $100 which has not been paid because of the plaintiff's refusal to sign the final voucher.

The plaintiff urges here that its contract with the Government should be reformed and enforced as reformed because of either (1) mistake of fact on its part and unconscionable conduct on the part of the Government, or (2) mutual mistake of fact.

At the time the contract was awarded to the plaintiff, pursuant to its bid, and at the time it signed the contract, the plaintiff was not mistaken. It had become aware of the mistake in its bid, and faced the problem of whether it was willing to sign a contract for the figure which it had, by mistake since discovered, bid. The Government was also aware of the plaintiff's claim that it had made a mistake in its bid. There was not, then, at the time of signing the contract, any lack of knowledge, either mutual or unilateral, which caused either of them to make the contract which they did make, when in fact they intended to make a different contract. That being so, if we should reform the contract as the plaintiff requests, we would be making for the parties the very contract which one of them, the Government, expressly refused to make at that time, though requested to do so by the plaintiff.

The plaintiff's contention, to have any merit at all, must relate to the events preceding the signing of the contract. It must relate to the situation after the plaintiff had made its mistaken bid, and had later discovered the mistake and asked, without avail, that its bid be either modified or rejected. If the plaintiff's bid had been an ordinary revocable offer, it would, upon the discovery of its mistake before acceptance of its offer, have been completely free to revoke its offer and escape a burdensome contract. If, instead of revoking, it had advised the offeree of the mistake and asked him to give it a contract for a higher price than the one offered, and the offeree had refused to do so, the plaintiff might have been in about the same dilemma it was in here. If the offeree was its best customer, the plaintiff might have concluded to stand by the mistaken offer and kept the customer's good will, even though it was free to revoke. If it did let the mistaken offer stand, and made a contract in accordance with it, it could not later claim that that contract should be reformed. It could not be said that it was unconscionable for the offeree to refuse to contract to pay more than he was willing to pay, just because that refusal put the plaintiff in the embarrassing situation of having to choose whether it would go back on its offer, or stand by its word, even to its immediate harm, in order to keep the good opinion of a customer.

The plaintiff's situation here differs from the one discussed above only in the respect that the plaintiff's offer, or bid, was, in terms, irrevocable, and was accompanied by a bond so that the revocation of the bid would have subjected the plaintiff to a liability, unless the mistake which was involved in the bid would have constituted a defense to enforcement of the bond. There was at least a serious possibility of liability on the bond. Was this potential liability, which was one of the factors which the plaintiff considered in deciding to sign the contract, coercive in the sense that it can be said that the contract was signed under duress? It should be said that this factor was not, apparently, the dominant one in arriving at the decision to sign. The dominant factor, it may be inferred from the testimony of the plaintiff's official, was the desire of the plaintiff to keep the good will of its best customer. But to whatever extent the liability on the bid bond was coercive, was it unfairly or unconscionably so?

The Government is required by law to award certain of its contracts on the basis of competitive bids, after advertisement. To make the system work without undue delays and without the opening of the bids being used unfairly to obtain a disclosure of what competitors are offering, it is necessary that the bids be firm bids, backed by a guaranteed willingness to sign a contract at the bid price. To have a set of bids discarded after they are opened and each bidder has learned his competitor's price is a serious matter, and it should not be permitted except for cogent reasons. We seriously doubt whether the plaintiff's estimator, Owens, exercised the care in preparing and presenting the plaintiff's bid which was called for by the important problem with which he was dealing. If not, the plaintiff would not and should not have been released from liability upon its bid bond, since one of the purposes of the bond was to cause bidders to exercise due care. But if the plaintiff, in the circumstances, did not have the right, or if the District Engineer reasonably thought the

644

plaintiff did not have the right to be released without penalty from its bid bond, it was not improperly coercive, or unconscionable, conduct on his part to refuse to voluntarily release the plaintiff. He had the right, and probably the duty, to insist upon what he, reasonably, thought were the Government's rights. That this insistence put the plaintiff in the position where it had to make up its mind whether it would be wiser to refuse to sign the contract and contest by litigation its liability on the bond, or to sign the contract, keep its reputation clear with the Government and seek relief through the discretionary action of higher officials, did not make the insistence unconscionable.

This case differs from the case of Edmund J. Rappoli Co. v. United States, 98 Ct.Cl. 499, in the respect that in that case the court found that, concurrently with the signing of the contract, the Government's agents promised the contractor that, upon the fulfillment of certain conditions that were found by the court to have been fulfilled, the mistake would be corrected. Here no such promise was made.

The plaintiff's contract was not made by mistake, nor because of duress or coercion. The petition will be dismissed. It is so ordered.

WHALEY, Chief Justice, and WHITAKER, Judge, concur.

LITTLETON, Judge, dissents.

JONES, Judge, took no part in the decision of this case.