**ALBERT & HARRISON, Inc., v. UNITED STATES.**

No. 46125.

Court of Claims.
Dec. 2, 1946.

WHITAKER, Judge, dissenting in part.

Foster Wood, of Washington, D. C., for plaintiff.

Currell Vance, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

MADDEN, Judge.

The plaintiff, a partnership, sues to recover the cost of alleged extra work, additional pay to bricklayers, and liquidated damages withheld by the Government, in connection with its contract with the United States for the renovation of three buildings at the Raritan Arsenal, Metuchen, New Jersey.

The claim for extra work is based upon an allegedly misleading drawing which the Government sent the plaintiff as a part of its invitation for bids on the project. There were three buildings to be renovated, numbered N-5, M-4, and L-3, each about 600 feet long and 115 feet wide. Each was divided by cross partitions into seven so-called bays, lettered A to G.

There were piers along the east and west walls of each building, leaving spaces 13 feet wide between them. Thus there were 74 of these spaces in each building, 37 in the east wall and 37 in the west wall. Before the renovation, in building N-5, 56 of these spaces were occupied by large windows, and 18 by doors. In buildings M-4 and L-3, with which this suit is concerned, all the spaces were occupied by doors. The planned renovation was to consist in bricking up all of these doors except one or two in each bay, to replace the remaining doors with new ones of smaller size, which would require some new brick work around them, to install new offices, toilets, etc., to make extensive repairs to the roofs, and other repairs.

The invitation for bids which was sent to the plaintiff contained, as is usual, a copy of the proposed contract and specifications, and two large drawings, one relating to building N-5, numbered D-198, and the other relating to buildings M-4 and L-3, numbered D-197. The specifications, which are quoted in finding 7, say, as to the latter two buildings, "The renovation * * * by the replacing of existing doors with brick, metal doors, and sash as indicated. * * *" Nothing is said as to the number of doors to be replaced. Drawing D-198, relating to building N-5, indicated intelligibly all the existing openings and all the proposed openings to be left in that building. Drawing D-197, which was otherwise similar to D-198, showed only one large door in each bay of those buildings, which would have been fourteen doors in each building, or 28 in all. The drawing had written on it the note "Replace existing doors, east and west walls, with brick and doors as indicated." There was also the word "Brick" in light letters, printed on the space on each side of the door on the drawing. Its light lettering indicated that it meant that the space was presently occupied by brick. To indicate new brick it should have been heavily printed, and heavy hatching should have been placed in the area.

The draftsman of the drawing probably intended that the doors shown were to be the new doors in the completed work, and

the brick was to be the new brick replacing doors that were to be closed up. But the drawing did not disclose this intention and the plaintiff did not so read it. The plaintiff reading D-197 in connection with D-198 computed the amount of new brick work required for the two buildings M-4 and L-3 as being very small, and made its bid accordingly. It was warned by G-C2 of the specifications to visit the site for various stated purposes, which purposes did not include that of determining whether the drawings were correct. It did not visit the site though it could easily have done so, its office in New York being only some thirty-five miles away.

■ The plaintiff was the low bidder and was immediately requested by the contracting officer to come to the arsenal and sign the contract. One of the plaintiff's partners went to the arsenal, and immediately discovered that there were 116 more openings to be bricked up than the plaintiff had expected. The plaintiff requested that new bids be called for. The Government threatened to forfeit the plaintiff's bid bond if it did not sign the contract and proceed with the work. Some days later the plaintiff did sign the contract, protesting orally against doing so, and proceeded with and ultimately finished the work. It renewed its claim for extra compensation to the Contracting Officer and appealed his adverse decision to the Secretary of War, who also denied his claim. The Secretary sent the claim to the General Accounting Office which also rejected it.

We think the plaintiff is entitled to recover. The specifications and the two drawings, in conjunction, were misleading, and had the effect of misleading the plaintiff into making a bid which it would not otherwise have made. The bid was required to be irrevocable and to be backed by a substantial bond, and exposed the plaintiff to liability to the Government for any increased costs resulting from performance by some other contractor, if the plaintiff refused to perform. We think that the plaintiff was coerced by these circumstances into signing the contract when the Government had no right to a contract based on the plaintiff's bid. The situation is quite different from that in the Massman case, Massman Construction Co. v. United States, 60 F.Supp. 635, 102 Ct. Cl. 699. There the Government was in no way at fault or responsible for the plaintiff's mistake, and the plaintiff was probably not entitled to withdraw its bid. It was, therefore, not improperly coercive for the agent of the Government to threaten to enforce the bid bond. Here the plaintiff's dilemma was the result of the Government's misleading documents.

■ The plaintiff's second claim is for a part of the wages of bricklayers employed by the plaintiff's subcontractor, whom the plaintiff has reimbursed. The proposed contract and specifications, which were a part of the invitation for bids, called the bidders' attention to the statute which required contractors on public buildings to pay not less than the wage rates determined by the Secretary of Labor to be the prevailing rates. The specifications stated that the Secretary had determined the prevailing rate for bricklayers in this area to be $1.50 per hour. In fact, the Secretary determined on April 4, 1941, that the prevailing rate in the area was $1.75 per hour. While the specifications which accompanied the invitation for bids, and which stated the determined wage rate to be $1.50 per hour, were, no doubt, prepared before the new wage rate was determined on April 4, 1941, the new rate was determined some weeks before the contract was made, and the plaintiff should have been advised of it. Not being so advised, the plaintiff underestimated the costs of bricklaying, and may recover the amount, $1,216.95, which it was obliged to pay to bring its wages up to the newly determined rate. We recognize, of course, that the statute requires the payment of the determined rate as a minimum, and does not forbid the payment of a higher rate. But the rate determined to be the prevailing rate is, by hypothesis, the rate customarily paid, and the rate at which a contractor could expect to hire his labor. Here the claim of the bricklayers for $1.75 was based entirely upon the fact that the prevailing rate as determined by the Secretary of Labor was, in fact, $1.75. But the Government had represented that it was $1.50,

and the plaintiff is entitled to recover because of the misrepresentation.

The plaintiff's third claim is that $950, which was assessed against it as liquidated damages and deducted from the payments made to it on the contract, was wrongly deducted. We have found that the plaintiff was diligent in the performance of its work, and that its late completion of its work was caused by a change made by the Government in the width of the copper flashing to be used on the roof, together with a truckmen's strike at Pittsburgh, which delayed delivery of necessary material. Under the terms of Article 9 of the contract, quoted in finding 20, liquidated damages should not have been assessed, and the plaintiff is entitled to recover on this claim.

Judgment will be entered for the plaintiff in the amount of $19,766.95. It is so ordered.

WHALEY, Chief Justice, and JONES and LITTLETON, Judges, concur.

WHITAKER, Judge (dissenting in part).

I do not think plaintiff is entitled to recover for bricking up the doors not shown on the plans, because of the fact that it signed the contract with knowledge that the contracting officer interpreted the plans and specifications to require that they be bricked up, and would insist upon this being done.

The fact that the contracting officer told plaintiff that its bid bond would be forfeited if it did not sign the contract does not amount to duress. If plaintiff had been excusably misled by the plans it had a right to withdraw its bid without incurring any liability on the bid bond. Presumably it knew this and, therefore, could not have been coerced by the contracting officer's threat. Hartsville Oil Mill v. United States, 271 U.S. 43, 48, 46 S.Ct. 389, 70 L.Ed. 822, and cases cited.

Its failure to withdraw its bid and its signing of the contract, I think, bound it to do the work required of it.

I understand this to have been our holding in Massman Construction Co. v. United States, 60 F.Supp. 635, 102 Ct.Cl. 699, certiorari denied, 325 U.S. 866, 65 S.Ct. 1403, 89 L.Ed. 1985.