EAGLE CONSTRUCTION CORP.,
Plaintiff,

v.

The UNITED STATES, Defendant,
and

Allis-Chalmers Corp., Intervenor.

No. 39–83C.

United States Claims Court.

Jan. 24, 1984.

Douglas K. Olson, Washington, D.C., for plaintiff; Wilkes, Artis, Hedrick & Lane, Washington, D.C., of counsel.

William S. Liebman, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant; John J. Mahon, Army Corps of Engineers, Washington, D.C., of counsel.

Thomas F. Williamson, Washington, D.C., for intervenor; Morgan, Lewis & Bockius, Washington, D.C., of counsel.

## OPINION

MAYER, Judge.

Plaintiff Eagle Construction Corporation (Eagle) brought this case to enjoin the award of a government contract for the manufacture and installation of hydraulic turbines. The case is before the court on intervenor's motion to dismiss and defendant's and intervenor's motions for summary judgment.

## BACKGROUND

In 1979, the Department of Defense (DOD) proposed modifying the Defense Acquisition Regulations (DAR) to implement Memoranda of Understanding between the United States and its NATO allies, *see* DAR § 6–1401, 32 C.F.R. § 6–1401, exempting those countries from the price differentials of the Buy American Act, 41 U.S.C. §§ 10a–10d, for defense acquisitions. Under the Act, a 6%, 12%, or 50% price differential is applied in evaluating foreign bids unless the offeror has proposed a product whose domestic component costs exceed 50%. *See* DAR §§ 1–6.104.-4(b) and 6–1403.1(c); Executive Order 10582, 19 Fed.Reg. 8,723 (1954), *reprinted in* 41 U.S.C. § 10d; *see also* DAR § 6–0001.1(c).

In comments submitted to DOD in July of that year, intervenor Allis-Chalmers expressed concern that the proposed revision of the DARs might "result in acutely unfair and possibly illegal advantages to foreign suppliers" in civil works procurements by the Army Corps of Engineers (Corps). To alleviate this concern, Allis-Chalmers suggested that the proposed revision be modified to expressly exclude civil works procurements and that DOD continue to follow a modified Buy American policy using a 50% differential factor for evaluating these procurements. If DOD did not follow its recommendations, Allis-Chalmers predicted that the United States would lose its only remaining domestic hydraulic turbine manufacturer.

Allis-Chalmers' recommendations were reviewed by John Osterday, an official in the Office of the Deputy Undersecretary of Defense for Acquisition Management. He recommended to the then Acting Deputy Undersecretary that DOD not exclude civil works procurements as requested by Allis-Chalmers, but add hydraulic turbines to the

DAR § 6–1405 list of defense-related items whose acquisition is not subject to the policies and procedures of part 14 of DAR § 6 because the United States must preserve a domestic capability to produce this item to maintain its defense mobilization base. Osterday said the Army, the Department of Commerce, and DAR Committee representatives concurred. He added that this would be consistent with the intent of agreements between the United States and foreign countries covering the protection of United States production capability for critical national defense items.

So in September of 1979, contrary to Allis-Chalmers' proposal, DOD added hydraulic turbines to the DAR § 6–1405 list. Three months later, the Swiss ambassador formally protested the listing. In the weeks that followed, representatives from the Swiss embassy met on several occasions with DOD personnel to discuss the matter. On the other hand, a United States Senator sent DOD a letter in support of the listing at the request of Allis-Chalmers, one of his constituents.

Between 1980 and 1982, a representative of Allis-Chalmers met with Osterday over lunch to discuss the listing of hydraulic turbines and the impact that listing would have on the proposed procurement for the Richard B. Russell hydro-electric project in Georgia. Allis-Chalmers, like Eagle and many other companies, knew the general requirements for this procurement months before it was issued because the Corps had sought comments from the hydro-equipment industry on proposed technical specifications for the project. Osterday offered to pay for his lunches during these meetings at a restaurant near the Pentagon, but the Allis-Chalmers representative picked up the tab.

In March of 1982, Allis-Chalmers submitted a report to DOD on its current status as a critical defense supplier pursuant to Defense Acquisition Circular 76–25, ¶ 6–1405. In the report, Allis-Chalmers urged that foreign competition be excluded until its backlog of sales reached the minimum rate to sustain its position as a viable supplier of hydraulic turbines. On August 5, 1982, the new Deputy Undersecretary of Defense for Acquisition Management (Deputy Undersecretary for Acquisition) issued a memorandum addressing the need to preserve a domestic capability for hydraulic turbines. The memorandum defined a domestically produced turbine as follows:

a. All of the costs related to providing the material, engineering, manufacturing, maintenance and repair including labor costs must be domestic. This should not include costs generated at the installation site except when the manufacture or maintenance must be accomplished at the site.

b. The only exception allowed to "a" above is when the material or services are not available in sufficient quantity from domestic sources (U.S. and Canada) to meet National defense requirements.

On August 17, 1982, the Savannah District of the Corps issued step one of a two-step solicitation, No. DACW21–82–R–0040, inviting technical proposals for the manufacture and installation of four reversible hydraulic pump turbines for the Richard B. Russell Project. The solicitation provided in part:

5. FOREIGN SOURCE COMPETITION. In accordance with Section 6, Paragraph 6–1405, Defense Acquisition Regulations, it has been determined that this procurement is not to be supplied from any foreign source, with the exception of Canada. Therefore, technical proposals will be accepted from United States and Canadian sources only. This restriction is considered necessary for reasons of national interest.

Technical proposals received from foreign sources, with the exception of Canada, will be rejected.

5.1 Bids or proposals for this procurement are being solicited from Canada. If a bid or proposal from such a source would be acceptable from the standpoint of price and other factors, the Department of Defense 50% International Balance of Payments evaluation factor will be waived. Application of either the 6%

or 12% factor in evaluating Canadian bids remains in force.

The contracting officer for the procurement did not receive a copy of the August 5 memorandum until September 7, 1982. Sixteen days later, he issued Amendment 0001 to the solicitation making several changes in the technical requirements not pertinent here, revising paragraph 5.1 of the solicitation which was later deleted by Amendment 0002, and adding a new paragraph 5.2 to define "Domestically Produced Products," quoting the August 5 memorandum defining a domestically produced turbine.

On October 28, 1982, step one of the solicitation closed. The Corps received technical proposals from Eagle, Allis-Chalmers, and Dominion Bridge-Sulzer, Inc. While these proposals were being evaluated, Eagle filed a bid protest with the General Accounting Office (GAO) over the listing of hydraulic turbines on DOD's critical defense item list.

In January of 1983, the Deputy Undersecretary for Acquisition issued a memorandum explaining that the domestic cost requirement of his August 5, 1982, memorandum did not apply to basic research and development costs. At the same time, Allis-Chalmers asked a United States Senator and the Congressman representing the district in which its hydraulic turbine plant was located to send letters to the Undersecretary of Defense for Research and Engineering (Undersecretary for Research) supporting the continued listing of hydraulic turbines and the 100% North American content requirement.

In late January, Eagle filed a complaint in this court seeking injunctive relief and asking the court to declare the listing of hydraulic turbines under DAR § 6–1405 unlawful; Amendment 0001 unduly restrictive and in violation of the DARs; and that DOD should reinstate the 6% and 12% evaluation factors.* The parties requested, however, that the court defer ruling on

Eagle's complaint until the Comptroller General issued a decision on the bid protest. The court granted the request. In late March, Eagle amended its complaint to allege that the government's actions were tainted by apparent or actual conflicts of interest on the part of the Deputy Undersecretary for Acquisition who had recently left DOD to return to the law firm from which he had come. The allegation was based on a member of this law firm representing a joint venture in which Allis-Chalmers was a former partner.

On April 5, 1983, the new Acting Deputy Undersecretary for Acquisition issued a memorandum withdrawing the August and January memoranda of his predecessor pending completion by the Corps of a study and technical analysis of defense mobilization needs for hydraulic turbines. This memorandum referred to questions raised by government contractors and members of Congress and cited the bid protest filed with GAO and the complaint in this court.

Because of the withdrawal of the earlier memoranda, the Washington headquarters of the Corps recommended that the solicitation be cancelled. The court was notified and on April 22, 1983, the contracting officer cancelled it. Several weeks later, he issued a determination and finding (D & F) setting forth the sequence of events which led to cancellation and concluding:

> Based on the unresolved [GAO] protest filed by Eagle ..., the withdrawal of the previous memoranda issued by Department of Defense and the request for cancellation [by headquarters] ..., I have determined it would be in the best interest of the Government to cancel this solicitation in its entirety and to readvertise when and as directed by higher competent authority.

As a result of the cancellation, GAO denied the protest as moot.

On May 19, 1983, 25 congressmen wrote the Undersecretary for Research in support of the 100% domestic content requirement

---

* Plaintiff's complaint asserted jurisdiction under a multitude of statutes, but in its response to defendant's and intervenor's motions it prudently specified only one, 28 U.S.C. § 1491(a)(1), and restated its demand for equitable relief under section 1491(a)(3).

and the listing of hydraulic turbines under DAR § 6–1405. In early June, the court granted Eagle's motion for leave to amend its complaint a second time by adding a claim for bid and proposal costs based on the cancellation and plaintiff's earlier allegations of impropriety.

Shortly thereafter, the Corps completed its technical analysis of defense mobilization needs and concluded that there was a need for maintaining suitable hydraulic turbine facilities in the United States to repair or replace critical turbine components which may be damaged during a national emergency. As a result, it recommended that procurements for hydraulic turbines require that the manufacturer be located in the United States or Canada and maintain repair facilities. On July 15, 1983, the Undersecretary for Research issued a memorandum reviewing the Corps' analysis and the questions raised by contractors and members of Congress. He found:

(1) that the domestic (including Canada) base for certain engineering capability and specific items used in hydraulic turbines is essential to national defense and is required to support our mobilization base in case of a national emergency;

(2) that the use of strictly Buy American Act provisions, as set forth in the DAR, is not adequate to ensure preservation of our domestic industrial base; and

(3) that there is a need for immediate action to assure that required Corps of Engineers items for turbines be procured from domestic sources.

In light of these findings and Executive Order 11490, which assigns the Secretary of Defense responsibility for maintaining the mobilization base, the Undersecretary concluded that "procurement of hydraulic turbines by the Corps must be based upon maintaining a domestic repair base facility for large custom type hydraulic turbines and pump turbines."

In early September, one day before the Corps issued a new solicitation for the Russell Project, Eagle asked this court to issue a temporary restraining order and preliminary injunction against any new procurement action for this project. The court denied the request for a temporary restraining order.

Step one of the new solicitation, No. DACW21–84–R–0001, was issued September 7, 1983, and closed on November 18, 1983. The Corps received four technical proposals, none of which was from Eagle.

## CONTENTIONS

Plaintiff seeks to enjoin the second solicitation and to have this court declare the cancellation of the original solicitation, Amendment 0001 of that solicitation, and the listing of hydraulic turbines unlawful because all were procured by preferential treatment resulting from misrepresentations by Allis-Chalmers, congressional interference, conflicts of interest on the part of the Deputy Undersecretary for Acquisition, and the acceptance of gratuities by Osterday. Plaintiff asserts that Allis-Chalmers misrepresented the state of the domestic hydraulic turbine industry to DOD officials, and that DOD did not solicit information from Eagle or other representatives of the industry because Osterday and the Deputy Undersecretary for Acquisition sought to make Allis-Chalmers the sole source for future hydraulic turbine procurements. It alleges that Osterday was motivated by the free lunches he received. The Deputy Undersecretary acted in favor of Allis-Chalmers because he intended to return to a law firm where a senior partner had a "close working relationship" with the top official of Allis-Chalmers. Eagle argues that the Deputy Undersecretary's intent can be adduced from his August and January memoranda, which were designed to benefit Allis-Chalmers. It says that the August memorandum and Amendment 0001 imposed a 100% domestic content requirement which only Allis-Chalmers could meet even though the DARs permitted a lesser requirement that Eagle could satisfy. The January memorandum allowed the use of foreign licenses for hydraulic turbines which would be required by Allis-Chalmers, but precluded any foreign engineering assistance to transfer or implement a license which

would be required by Eagle and any other potential competitor of Allis-Chalmers.

In response, intervenor Allis-Chalmers argues that after extensive discovery Eagle has failed to support a single allegation of misrepresentation by Allis-Chalmers. The letters complained of were routine actions by members of Congress on behalf of a constituent. The lunches attended by Osterday were merely occasions to obtain information about Allis-Chalmers and the hydraulic turbine industry. The allegations against the Deputy Undersecretary for Acquisition are insufficient to raise an inference of a conflict of interest. Amendment 0001 was only a clarification of the earlier provision of the contract, not a significant change in the content requirement. And Eagle received the review it wanted when DOD cancelled the solicitation and the Corps conducted its study and technical analysis.

Intervenor has moved to dismiss the complaint because this court lacks jurisdiction to grant equitable relief on a claim attacking the legality of a regulation or to enjoin the award of a contract under the new solicitation on which Eagle did not bid. It has also moved for summary judgment on the grounds that Amendment 0001 to the original solicitation was not unduly restrictive or unlawful, no misrepresentations were made by Allis-Chalmers, cancellation and issuance of a new solicitation was neither unjustified nor unlawful, there was no congressional interference, and there were no gratuities or conflicts of interest involving DOD officials.

Defendant United States has moved for summary judgment, saying this court has no jurisdiction over plaintiff's claims because there is no implied contractual relationship between plaintiff and defendant with respect to the new solicitation, and plaintiff's claims about the cancelled solicitation are not based on breach of the implied contract for full and fair consideration of its proposal. Plaintiff is not entitled to injunctive relief reinstating the cancelled solicitation because the complaint fails to state a claim upon which relief can be granted.

## DISCUSSION

■ The equitable authority of this court under 28 U.S.C. § 1491(a)(3) is to be strictly construed and not expanded by implication. *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1373 (Fed.Cir.1983); *Speco Corp. v. United States,* 2 Cl.Ct. 335, 337 (1983). And in cases like this one, the court is mindful of its obligation to "give due regard to the interests of national defense and national security." 28 U.S.C. § 1491(a)(3). *See Southwest Marine, Inc. v. United States,* 3 Cl.Ct. 611, 613 (1983). These admonitions govern the court's review.

■ For plaintiff to have a claim for equitable relief, it must show that its proposal in response to the first solicitation was not fully and fairly evaluated or considered. Except in rare cases, discussed below, this court's authority to award equitable relief under 28 U.S.C. § 1491(a)(3) arises from demonstration that the government has not fully and fairly considered a contractor's bid, which it impliedly agrees to do in every procurement in which a bid responsive to the invitation is submitted. *See, e.g., Yachts America, Inc. v. United States,* 3 Cl.Ct. 447, 450 (1983); *Ingersoll-Rand Co. v. United States,* 2 Cl.Ct. 373, 375 (1983); *Indian Wells Valley Metal Trades Council v. United States,* 1 Cl.Ct. 43, 45 (1982). This is, of course, the same basis on which the court may award bid preparation costs. *See Keco Industries, Inc. v. United States,* 428 F.2d 1233 (Ct.Cl.1970); *Heyer Products Co., Inc. v. United States,* 140 F.Supp. 409 (Ct.Cl.1956).

*Challenge to Regulation and Solicitation*

The essence of plaintiff's complaint is not that its proposal was denied fair consideration. Indeed, the proposal was not rejected or even found technically unacceptable. Rather, plaintiff attacks the development and content of the cancelled solicitation, saying the requirement added by Amend-

ment 0001 that all component costs at all tiers be domestic was illegal. And it challenges the listing of hydraulic turbines under DAR § 6–1405 in the first place. The consequence of that listing was that foreign bids had to comply with the Buy American Act and could not have the competitive advantage offered by DAR § 6–1401. Amendment 0001 restricted this procurement even further.

A similar situation faced the court in *Ingersoll-Rand Co. v. United States,* in which a plaintiff brought a bid protest suit to enjoin award of a subcontract for air compressors. Plaintiff manufactured one type of compressor, while the competitor who was to receive the contract produced another type. Plaintiff claimed there that the government officials who drafted the solicitation were biased in favor of the competitor and wrote the solicitation so as to give the type compressor produced by the competitor an advantage over plaintiff's. The government was said to have imposed costly requirements on plaintiff's compressors but not those of the competitor and the solicitation was therefore invalid.

The court defined our jurisdiction as limited "to situations where a bid complies with the terms of a bid invitation but is, nevertheless, not fully and fairly considered. It is the plaintiff's compliance with the solicitation that forms the consideration for the implied contract of fair dealing. This contractual right cannot entitle bidders to challenge the terms of the bid solicitation since the solicitation comes into existence before the implied contract and, in fact, forms the basis of that contract." 2 Cl.Ct. at 376. Violations of law, rule, or regulation in the structuring of a solicitation, which our plaintiff alleges, are breaches of statutory or regulatory obligations, not contractual ones, and this court does not have the authority to redress them either in law or equity through a disappointed bidder suit. *See Cecile Industries, Inc. v. United States,* 2 Cl.Ct. 690, 693 (1983); *Quality Furniture Rentals v. United States,* 1 Cl.Ct. 136, 139 (1983); *Keco Industries, Inc. v. United States,* 428 F.2d at 1236; *Heyer*

*Products Co., Inc. v. United States,* 140 F.Supp. at 412.

■ Therefore, the court's jurisdiction over the implied contract of fair dealing in disappointed bidder cases embraces neither claims challenging terms, conditions, or requirements of solicitations, nor policies and activities which preceded and resulted in the solicitations. The claims arise from the implied contractual relationship with the government and the court will not entertain actions which fall short of that requirement. Nor may the court tamper with the terms of a solicitation. Disappointed bidder suits are based on aggrieved bidders' standing to "satisfy the public interest in having agencies follow the regulations which control government contracting," *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859, 864 (D.C.Cir.1970); *see CACI, Inc.-Federal v. United States,* 719 F.2d 1567, 1573 (Fed.Cir.1983), not to compel the government to redefine national defense requirements or rewrite solicitations.

Plaintiff contends that the government has unlawfully restricted the hydraulic turbine procurement to favor Allis-Chalmers, but it does not anywhere say it could not comply with the requirements of the solicitation. Its submission of a proposal, even after the solicitation was amended, represents that it could comply. Of course, if it could not, the proposal submitted was nonresponsive and no duty to consider the bid arose at all. *Yachts America, Inc. v. United States,* 3 Cl.Ct. at 450.

Plaintiff's reliance on *Electro-Methods, Inc. v. United States,* 3 Cl.Ct. 500 (1983), *argued,* No. 84–520 (Fed.Cir. Jan. 11, 1983) (interim order continuing stay of judgment below issued), to show that it was denied a fair opportunity to compete under the cancelled solicitation is misplaced. In that case, DAR suspension provisions were invoked against a contractor after it had submitted a bid, thereby disqualifying it from receiving the contract. Here, plaintiff's status as a potentially eligible bidder was not affected by any procedural rules disabling it from successfully bidding. DAR § 6–1405 and Amendment 0001 are sub-

stantive requirements which ultimately define the terms of the solicitation and affect all bidders the same. They were in existence and used in the solicitation before plaintiff submitted its proposal. Plaintiff's submission in response to the solicitation represented that it could comply with its terms, and demonstrates the inapplicability of *Electro-Methods* to its predicament, irrespective of the Court of Appeals' ultimate disposition of that case.

*Cancellation of Solicitation*

Plaintiff's arguments about the pre-bid conduct of the government and Allis-Chalmers and the alleged violation of DAR § 6–1405 might be relevant if they transcend the solicitation and cast doubt on the fairness of the government's actual evaluation of plaintiff's proposal. It is undisputed, however, that none of the proposals submitted, plaintiff's included, were ever found unacceptable. Nevertheless, plaintiff claims that the cancellation was one more event in the "conspiracy" to favor Allis-Chalmers, and was done to cover up the wrongdoing that went before. In essence, plaintiff says that the arbitrary and illegal cancellation was equivalent to illegal rejection of the proposal.

In the exercise of its equitable authority, the court has concluded that cancellations of solicitations after jurisdiction over a disappointed bidder case has attached may be reviewed. *Northern Virginia Van Co. v. United States,* 3 Cl.Ct. 237, 241 (1983); *Kinetic Structures Corp. v. United States,* 2 Cl.Ct. 343, 344 (1983); *P. Francini & Co., Inc. v. United States,* 2 Cl.Ct. 7, 9 (1983); *P. Francini & Co., Inc. v. United States,* 2 Cl.Ct. 1, 6 (1983); *see F. Alderete General Contractors, Inc. v. United States,* 715 F.2d 1476 (Fed.Cir.1983). It is, therefore, appropriate to consider whether the cancellation in this case was justified or whether, as plaintiff says, it was illegal and provides a basis for injunctive relief and the award of proposal preparation costs.

This was not a negotiated procurement to which code and DAR provisions plaintiff cited would apply. It was a two-step, formally advertised procurement not governed by those authorities. DAR § 2–501 defines the two-step method of procurement.

Two-step formal advertising is a method of procurement designed to expand the use and obtain the benefits of formal advertising where inadequate specifications preclude the use of conventional formal advertising. It is especially useful in procurements requiring technical proposals, especially those for complex items. It is conducted in two steps:

(i) Step one consists of the request for, and submission, evaluation, and, if necessary, discussion of a technical proposal, without pricing, to determine the acceptability of the supplies or services offered. As used in this context, the word "technical" has a broad connotation and includes engineering approach, special manufacturing processes, and special testing techniques. When it is necessary in order to clarify basic technical requirements, related requirements such as management approach, manufacturing plan, or facilities to be utilized may be clarified in this step. Conformity to the technical requirements is resolved in this step, but matters of responsibility as defined in 1–903 are not.

(ii) Step two is a formally advertised procurement confined to those who submitted acceptable technical proposals in step one. Bids submitted in step two are evaluated and the awards made in accordance with Parts 3 and 4 of this Section.

Exceptions applicable to negotiated procurements and the requirement for a D & F justifying a negotiated rather than a competitive procurement are inapplicable to a two-step, formally advertised one like this. If step one were to result in no or only one acceptable technical proposal, DAR §§ 2–503.1(h) and 3–210.3 would require a D & F to justify proceeding by negotiation instead. But that did not happen in this case.

Plaintiff also says that the cancellation and failure to prepare a formal D & F before the cancellation results in a violation of DAR § 2–404.1. That section provides:

*Cancellation of Invitation After Opening.*
(a) The preservation of the integrity of the competitive bid system dictates that after bids have been opened, award must be made to that responsible bidder who submitted the lowest responsive bid, unless there is a compelling reason to reject all bids and cancel the invitation. Every effort shall be made to anticipate changes in a requirement prior to the date of opening and to notify all prospective bidders of any resulting modification or cancellation, thereby permitting bidders to change their bids and preventing the unnecessary exposure of bid prices. As a general rule, after opening, an invitation for bids should not be canceled and readvertised due solely to increased requirements for the items being procured; award should be made on the initial invitation for bids and the additional quantity required should be treated as a new procurement.
(b) [Requires a D & F and describes its content.]

The applicability of this section and the need for a D & F before cancellation, therefore, is to preserve the integrity of the competitive bid system when a solicitation is cancelled "after bids have been opened," causing "the unnecessary exposure° of bid prices." As the Court of Claims said in *Massman Construction Co. v. United States,* 60 F.Supp. 635, 643 (Ct.Cl.1945), the reason for requiring a compelling reason before cancellation was because "each bidder has learned his competitor's prices." When bids are opened publicly before cancellation, exposure of prices makes bidders " 'sitting ducks' to serve as targets for competitors in the next round of bidding." *P. Francini & Co., Inc. v. United States,* 2 Cl.Ct. at 10. *See also M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1299 (D.C. Cir.1971).

█ Here, however, the solicitation was cancelled after only technical proposals were submitted under step one of the two-step process. No public bid opening occurred; in fact, no cost or pricing information was required or had been submitted to the Corps. Only the closing date for submission of technical proposals had passed, and in accordance with normal procedures the technical proposals have not been made public. Accordingly, even assuming failure to prepare a D & F in some circumstances would warrant relief, DAR § 2–404.1 is not applicable to this cancellation and could not have been violated.

Nevertheless, the contracting officer prepared a D & F after the cancellation. Though plaintiff claims the purpose of the cancellation was to conceal and perpetuate gross abuses of the procurement system, it has alleged no facts justifying even an inference that this was the purpose. Aside from the unsupported characterization of the cancellation, plaintiff makes no allegation about the findings in the D & F nor is there anything in the record which might suggest the D & F inadequately explains the justification for the cancellation.

█ Indeed, the cancellation gives plaintiff pretty much what it asked of the court. Plaintiff wanted judicial review of the listing of hydraulic turbines under DAR § 6–1405 and the amendment of the solicitation which this court has no authority to conduct. But as explained by the Acting Deputy Undersecretary of Defense for Acquisition in his April 5, 1983, memorandum withdrawing the earlier guidance and which led to the cancellation, the issues raised by plaintiff and others require "additional technical analysis to address defense mobilization needs with respect to hydraulic turbines . . . ." In other words, the cancellation resulted from a decision to conduct further study to address the issues plaintiff brought to court. Aside from the jurisdictional impediment to this court's review, judicial determination of national defense mobilization and industrial base requirements is singularly inappropriate. Administrative review by the Department of Defense which has the authority, responsibility, and expertise accommodates plaintiff's interest asserted in this suit.

*Congressional Interference*
█ There is no evidence that any wrongful considerations influenced the decision to can-

cel, much less the calibre of evidence that would be necessary to cast doubt on the actions of public officials. "A presumption of regularity supports the official acts of public officers, and in the absence of clear evidence to the contrary, it must be presumed that they have properly discharged their official duties .... [T]he parties attacking the legality of administrative action in the procurement field have the heavy burden of proving that such action was irrational or clearly illegal." *P. Francini & Co., Inc. v. United States,* 2 Cl.Ct. at 11.

Plaintiff makes much of what it says is congressional interference in the decision to place hydraulic turbines on the DAR § 6–1405 listing back in 1979 and to ensure their retention on the list since then, and asserts that this congressional activity favored and was instigated by Allis-Chalmers. The letters sent by a senator and the congressmen manifested their concern about the national security implications of maintaining hydraulic turbines on the list and apparently assumed Allis-Chalmers would be the beneficiary of that action.

The court sees nothing sinister in legislators writing letters on behalf of their constituents or expressing their views about national security. Nor is there anything per se sinister about executive branch officials considering these views in the decision-making process. The decision to either list hydraulic turbines or to retain them on the list, after all, was not a judicial or even a quasi-judicial action.

For purposes of disposing of this argument, it is helpful to divide the inquiry into two time frames: the first, from the listing of hydraulic turbines in 1979 to the issuance of Amendment 0001; the second, from issuance of the amendment to the present. As for activities which occurred during the first period, review in this court is foreclosed by the limited jurisdictional grant of authority this court was given by Congress. *See, e.g., Ingersoll-Rand Co. v. United States,* 2 Cl.Ct. at 376. The court observes, however, that no quasi-judicial administrative adjudication was involved in the gov-

ernmental processes during that time. The closest thing to rule-making, which can be viewed as adjudicatory, was the initial decision to list the hydraulic turbines. But government procurement activities are explicitly exempted from the Administrative Procedure Act's rule-making provisions. *See* 5 U.S.C. § 553(a)(2).

As far as the second time period is concerned, the congressional letter writing is relevant only if it can be said to have affected plaintiff's right to a full and fair consideration of its proposal. Cases cited by plaintiff as critical of congressional or other outsider meddling in executive functions deal with instances of quasi-judicial decision-making, thereby raising due process concerns based on the mere fact of congressional intercession. *See U.S. Lines, Inc. v. Federal Maritime Commission,* 584 F.2d 519, 539 (D.C.Cir.1978) (ex parte contacts); *Koniag, Inc. v. Andrus,* 580 F.2d 601, 610 (D.C.Cir.1978); *Home Box Office, Inc. v. F.C.C.,* 567 F.2d 9, 51 (D.C.Cir.1977) (ex parte contacts). Where decision-making is not in that context, congressional interference in the process is actionable only if it impermissibly affects the decision of the executive with the responsibility to decide. *See Peter Kiewit Sons' Co. v. U.S. Army Corps of Engineers,* 714 F.2d 163, 169 (D.C.Cir.1983); *D.C. Federation of Civic Associations v. Volpe,* 459 F.2d 1231, 1246 (D.C.Cir.1971).

■ There is no due process concern in this case, only the government's obligation to fully and fairly consider plaintiff's proposal. Once again, however, since the proposal was not found unacceptable · the only possible concern can be the effect of the congressional interest on the decision to cancel. It is fair to say that the letters did enter the calculus resulting in the Acting Deputy Undersecretary's decision to withdraw the earlier guidance represented by his predecessor's memoranda, and the contracting officer's decision to cancel. But they were only one factor among many which influenced the cancellation of this confused and bedeviled procurement action. As observed by both the Acting Deputy Undersecretary

and the contracting officer, this procurement had come under the scrutiny not only of congressmen, but of other contractors, plaintiff, and the General Accounting Office and this court by virtue of plaintiff's challenges. In the face of this cacophony, it was not unreasonable or imprudent for the responsible officials at the Department of Defense to cancel the procurement and study the issues raised afresh.

If congressional interest contributed to the decision to cancel and review, this was part of what plaintiff also wanted. "A court must consider the decision-makers' input, not the legislators' output. The test is whether 'extraneous factors intruded into the calculus of consideration' of the individual decision-maker .... Congressional oversight serves as a vital control on the quality and propriety of low visibility executive decision-making. We are mindful, however, that zealous oversight can intrude on the rights of disputants in an administrative adjudication." *Peter Kiewit Sons' Co. v. U.S. Army Corps of Engineers,* 714 F.2d at 170.

The court is satisfied that the congressional interest shown here was at most but one factor in the decision-making process culminating in the cancellation. If its intent was to force the award of the contract to Allis-Chalmers, that did not happen. Even if there had been no expressions of congressional concern, under the circumstances then existing the decision to cancel and study the matter would not have been unreasonable. Plaintiff's theory that the cancellation deprived it of fair proposal consideration, akin to a defective administrative adjudication, if you will, is therefore not aided by its complaints about these letters.

■ If, as the court holds, the cancellation of the first solicitation was proper, it cannot be said that it was tantamount to denial of a full and fair consideration of plaintiff's proposal. Deprived of that argument and no other allegations of impropriety having been made about the evaluation process, plaintiff has shown no right to either equitable relief or the recovery of bid and proposal costs.

*New Solicitation*

Not only does this holding dispose of plaintiff's claims concerning the cancelled solicitation, but it severs whatever nexus might be thought to exist between that one and the new solicitation in response to which plaintiff did not bid. What was said earlier about the basis for the exercise of this court's equitable authority is equally applicable here. Because plaintiff has submitted no proposal in response to the new solicitation, the implied contractual obligation of the government to fairly consider the proposal simply does not arise. *See Yachts America, Inc. v. United States,* 3 Cl.Ct. at 450. The government had that obligation with respect to the cancelled solicitation and did not violate it. The cancellation ended that solicitation and the new one issued after the matter had been restudied therefore amounts to a new procurement action.

But plaintiff insists that it has incurred bid and proposal costs directly applicable to the re-solicitation and relies on *Yachts America,* as authority that the court retains jurisdiction over the new solicitation even though it has not re-bid. *Yachts America,* however, does not help plaintiff. In that case, the government acquired property on which plaintiffs had been operating a marina before the acquisition. After the acquisition, the Park Service, the agency managing the property, solicited bids with a view to awarding a concession contract to operate the marina. Plaintiffs sought an injunction on two grounds. They alleged that the Park Service had breached the implied contract to treat plaintiffs' bid fairly and honestly, and that the Park Service had also breached a pre-existing implied-in-fact contract under which the plaintiffs were entitled to a right of preference to any new concession contract.

With respect to the first contention, the court applied the rule that the implied contract of fair bid consideration only arises when the bid is responsive to the solicita-

tion. *See, e.g., M. Steinthal & Co. v. Seamans,* 455 F.2d at 1301; *Dean Forwarding Co., Inc. v. United States,* 2 Cl.Ct. 559, 565 (1983). The court found plaintiffs' proposal totally non-responsive and held that no implied contract of fair consideration arose. 3 Cl.Ct. at 450. That is consistent with the holding here. The court also observed that even a responsive bidder may not challenge the legality or propriety of a solicitation or seek injunctive relief based on alleged statutory or regulatory violations occurring in the pre-solicitation procurement process. *Id.* Again, this is consistent with the holding here.

As to the second contention, the court followed *American Hoist & Derrick, Inc. v. United States,* 3 Cl.Ct. 198 (1983), and reviewed plaintiff's assertion of a pre-existing implied concessioner's contract giving them a right of preference for any new contract to be issued for the operation of that marina. In *Yachts America,* plaintiffs' bid was totally non-responsive; in *American Hoist,* plaintiff asserted the government impliedly promised it the right to bid on the procurement and then reneged by setting it aside for small businesses which prevented plaintiff from bidding. Both cases held that the implied contracts asserted were within the contemplation of 28 U.S.C. § 1491(a)(1) and (a)(3), and that nothing in *United States v. John C. Grimberg Co.,* 702 F.2d 1362 (Fed. Cir.1983), was to the contrary. 3 Cl.Ct. at 450. Cases like those are rare and are a limited exception to the rule of *Ingersoll-Rand* and its progeny, and *Keco* and *Heyer,* that equitable relief and recovery of bid preparation costs, respectively, must be based on the implied contract for fair consideration.

 Plaintiff has not asserted, nor could it, that with respect to the new solicitation any implied contract exists, other than that relating to the cancelled solicitation, which is foreclosed. Accordingly, the court has no jurisdiction over the procurement initiated by the new solicitation.

*Conflicts of Interest and Misrepresentation*

 The court would be remiss if it did not address plaintiff's allegations of impropriety against two officials, Osterday and the former Deputy Undersecretary for Acquisition, and misrepresentation by Allis-Chalmers. As for the allegations premised on Osterday's lunches with a representative of Allis-Chalmers, providing them with "ample opportunity" to set a common strategy, and that Osterday thereby appeared to have violated applicable conflict of interest laws and regulations, *CACI, Inc.-Federal v. United States,* 719 F.2d 1567, 1580 (Fed. Cir.1983), holds that "the opportunity for and the appearance of impropriety" is "not an adequate or proper basis for enjoining the award of the contract." The same is true here. To find that these occurrences had any effect on the cancellation decision, the only relevant consideration, would require the court to base "inferences of actual or potential wrongdoing by the Department on suspicion and innuendo, not on hard facts." *Id.* at 1581. This the court cannot do. *Id.* Nor could the court award bid preparation costs on the basis of appearances, as opposed to an actual conflict of interest affecting the proposal consideration. Of course, to the extent the evidence was intended to raise questions about the listing of hydraulic turbines under DAR § 6–1405, that decision was made in 1979 by the DAR Committee, before plaintiff alleges any of the lunch meetings took place.

Plaintiff says that the former Deputy Undersecretary's law firm and Allis-Chalmers had a "close business relationship which could lead to future relationships if cultivated." And it says that he "had a potential personal financial interest in assisting Allis-Chalmers." This attempt to describe an actual conflict of interest or the appearance of one falls far short of persuasive factual allegations requiring pursuit by the court, especially in the face of intervenor's answers to plaintiff's interrogatories essentially refuting the accusation. It is not insignificant that plaintiff had received the answers to interrogatories even before stating the allegations in the second amended complaint. Yet in its response to

intervenor's motion for summary judgment it did not address the refutation at all.

Plaintiff made much of this claim early in the proceedings and its characterization of the situation was of grave concern to the court. But after ample opportunity for discovery it has failed to raise even an inference or suspicion of impropriety, much less the "hard facts" *CACI* requires before the court may consider relief. 719 F.2d 1567, 1581. In light of the disposition of this case, the allegations are also irrelevant.

 Finally, plaintiff complains that beginning before the addition of hydraulic turbines to the DAR § 6–1405 listing in 1979 and continuing through the issuance of Amendment 0001, Allis-Chalmers submitted information to DOD misrepresenting the state of the industry, its capabilities, and the capabilities of other companies in the field. Allis-Chalmers indignantly denies that it had engaged in this course of conduct and responds with a recitation of its own to show the truth of its representations and submissions to the Department. Eagle's point is that the Department based its decision to place hydraulic turbines on the list, to retain them there, and to solicit bids for the Richard Russell procurement, on the basis of faulty information intended to protect Allis-Chalmers from competition. The same information is said to have affected the Corps' study and analysis after the cancellation on the basis of which the new solicitation was issued.

Significantly, however, it has not been shown that this alleged misrepresentation affected the cancellation decision. The force of plaintiff's argument, of course, is undercut by the fact that in response to both solicitations Allis-Chalmers did in fact have competition. But the answer to the argument is that this court is foreclosed from considering the contentions as they pertain to the pre-solicitation period because of the limitation on its authority in disappointed bidder suits as discussed above; it is without jurisdiction to consider the argument about the post-cancellation period because the cancellation was proper and plaintiff has not bid on the new solici-

tation, as also discussed. If there is a judicial forum to cull through the national defense and security considerations and the state of the hydraulic turbine industry in the United States, it is not this court.

## CONCLUSION

Accordingly, defendant's motion for summary judgment and intervenor's motions for summary judgment and to dismiss are granted. The case will be dismissed, with costs to the prevailing parties. *See* 28 U.S.C. § 2412(a); RUSCC 54(d).

It is so **ORDERED**.